STATE of Missouri, Respondent,

v.

Harry Dean HURD, Appellant.

No. 9561.

Missouri Court of Appeals,
Springfield District.

Feb. 27, 1975.

John C. Danforth, Atty. Gen., David Robards, K. Preston Dean, II, Asst. Attys. Gen., Jefferson City, for respondent.

Donald L. Wolff, Clayton, for appellant.

Before BILLINGS, C. J., and TITUS and FLANIGAN, JJ.

TITUS, Judge.

Harry Dean Hurd was convicted by a jury of first degree murder (§ 559.010) for allegedly having shot and killed M. C. Curtiss with a .45 caliber automatic pistol in Pat's Cafe near Ft. Leonard Wood. Charged as a habitual criminal (§ 556.280), he was sentenced by the court to life imprisonment (§ 559.030) and appealed.[1]

To save the 1,000 proverbial words otherwise necessary to describe the picture scene of the event, we here reproduce an exhibit which depicts the inside of Pat's Cafe as it appeared immediately following the shooting.

1. All statutory references are to RSMo 1969, V.A.M.S., and all references to rules are to Missouri Supreme Court Rules of Criminal Procedure, V.A.M.R.

[See following illustration]

Just before the dinner hours on September 2, 1972, Warren G. Adams (a cafe employee) and Percy Gammage (a cafe patron) entered the restaurant. Patricia Stump (owner and operator of the cafe) arrived later and busied herself in the kitchen; she did not witness any of the activities directly associated with the shooting. Gammage sat at the table southeast of the jukebox, ordered dinner, and thereafter intermittently engaged in a game of pool with employee Adams.

M. C. Curtiss and Robert Glanton came into the cafe together and sat at the first table inside the entrance. The northwest corner of this table is five feet three inches from the corner or curvature of the bar. Curtiss sat on the west side of the table, Glanton sat on the north and they too ordered dinner. Shortly thereafter defendant and Jerry Wayne Goines arrived and seated themselves at the table with Curtiss and Glanton. Defendant sat at the east side of the table and Goines occupied the south seat. They also ordered meals. Before the shooting occurred, no untoward actions or conversations by or between any of the occupants of the four-man table were heard or observed by anyone.

When the four men had finished or were nearing the end of their repast, defendant left the table and was joined at the bar by Adams in interruption of the pool game. As requested, Adams gave defendant some toothpicks in a bottle which defendant passed to his dinner companions. Adams resumed the game with Gammage at the pool table. Gammage and Adams observed that Goines, Glanton and Curtiss generally maintained their seating positions throughout the meal, except that Goines once went to play the jukebox (it was playing when the shooting occurred) and Curtiss was last observed by Gammage as sitting at the southwest corner of the table with his back toward the pool table.

After resumption of the pool game, the players saw defendant a second time en-route from the table to the bar. Assuming that defendant wanted to pay his bill, Adams left the pool table bound for the backside of the bar. As Adams arrived at "that area on the west end of the bar," defendant was variously described as "either going towards the bar or in that vicinity" —"between the bar and the table," or being "on the east side" of the bar "turned towards" Adams "[a] feet [sic] or two away from the bar" and "[f]ive or six feet . . . maybe seven" north of the table "right alongside of the bar, back over toward the [east] kitchen door." Adams and Gammage did not then or at anytime see defendant in possession of a pistol or other weapon. It was when defendant and Adams were reportedly in the positions just described that the shooting started, sounding "as if you would take a package of firecrackers and light them." Gammage "hit the floor" near the southwest corner of the pool table and Adams hied himself into the kitchen through the west doorway, with neither seeing nor knowing who had fired the shots. Gammage testified: "I raised my head up after the firing, to the [west] side of the pool table, the corner. . . . I saw the end of a pistol, smoke coming out of the end of it. . . . [I]t appeared to be Mr. Goines holding the pistol. . . . He was standing at the northwest corner, a little out from the pool table . . . closer to that diagram of a man [Curtiss] laying [sic] on the floor there. [Defendant] was near the north side of the table . . . more or less to the . . . northeast corner." Gammage then saw defendant walk from the cafe via the east front door followed by Goines who immediately returned, "went to the [four-man] table and picked something off the table. . . . I don't know what it was [and then Goines] turned around and walked back out." When Adams looked out of the kitchen following the shooting, he saw Goines standing inside the front door. "He had a weapon in his hand and he moved back to the table . . . and picked up a weapon magazine

. . . laying [sic] on the east side of the table [and] turned and walked out." Adams did not observe defendant's departure.

When Goines left the cafe the second time, Gammage crawled to the window near the fan. Goines, then standing on the driver's side of an automobile, tossed something over the top of the car to defendant. The son of the cafe owner had been in his mother's trailer-home when he heard the shooting. He left the trailer after arming himself and saw two men, whom he could not recognize or describe, standing on either side of a car. The man "standing at the passenger side . . . was holding a handgun like he was reloading it." The description of the automobile's departure from the cafe property was that it "[j]ust drove off normally."

Thirteen minutes after receiving a 6:37 p. m. radio call, Deputy Sheriff Jesse Cole arrived at the cafe. Inside, he found two supine dead bodies; that of Curtiss was near the pool table; that of Glanton was at and partially under the north side of the table where the four men had been sitting. Both had pistols concealed in the waistbands of their trousers. The deputy found six .45 caliber casings at the locations indicated by small solid squares on the drawing; five .45 caliber expended bullets at the locations represented by small solid dots on the drawing; and a bottle of toothpicks on the bar at the place designated by a "T" on the drawing. According to the deputy, "[c]linical tests" revealed the casings and the bullets recovered at the scene and the one bullet later removed from Curtiss' body by Harvey E. Nickels, M.D., all came from the same gun which was never found.

Deputy Cole recounted that Glanton's body had three entry bullet holes in the back with a like number of exiting holes in the lower abdomen. Because Glanton's jacket showed "definite lead marks and powder burns," the deputy opined the weapon "would have had to have been fired anywhere from [within] eighteen to twenty four inches [of Glanton] to leave the amount of burn on him." Curtiss, the deputy testified, had been shot once in the left chest near the front of his arm with the bullet exiting from approximately the same area on the right side. According to deputy Cole, Curtiss had also been shot one time in the center of his back, "[f]airly high . . . and there was no exit hole for it."

Unobjected to conclusions and opinions of the deputy follow: One spent bullet recovered at the scene struck the west edge of the table top where the four had been sitting, ricochetted backward and came to rest near Glanton's left elbow; the second spent bullet struck the floor south of the table and could have been the one found on the pool table or near the fan; the third spent bullet, i. e., the one found at the south end of the cafe, came from "around the northwest corner of the building"; the fourth spent bullet hit the cafe ceiling at an unspecified location; and the fifth spent bullet passed through "something" before it lodged in Curtiss' left leg above the knee, penetrating the skin, but not breaking the pants cloth. A .45 caliber pistol generally "ejects the cartridges right rearward [although] occasionally one cartridge will go another direction." Because the spent cartridges were north and west of the table where decedents had been seated and the spent bullets were mostly south of that table (see exhibit drawing, supra), the person who fired the gun "had to a-been standing north of the table . . . where the bodies were found . . . between the table and the bar."

The original information jointly charged defendant and Goines with first degree murder by shooting Curtiss with a .45 caliber automatic pistol. After defendant was granted a severance and was denied his motion for joinder of the separate and additional charge that he had also shot and killed Glanton, an amended information was filed in the instant case charg-

ing only defendant with the murder of Curtiss by shooting him with a .45 caliber automatic pistol. Whether the state initially intended to charge defendant as the principal and Goines as an accessory to the murder, or vice versa, or whether the state, by the amended information, intended to charge defendant as the principal or as an accessory under § 556.170, we need not decide or ponder because an accessory before the fact, or an aider and abettor, may be informed against as if he were the principal without alleging the facts by which he aided and abetted or advised and procured the commission of the crime. State v. Lemon, 504 S.W.2d 676, 683[13] (Mo. App.1973). However, it appears that by the time the cause was submitted to the jury, the state had concluded (based primarily on the testimony of Deputy Sheriff Cole and the last observed positions of defendant immediately before the shooting) that if defendant was to be found guilty, it was in the role of principal. The court instructed the jury upon the exact hypothesis of the amended information, i. e., that defendant actually did the shooting, but did not submit an instruction which would permit the jury to find him guilty as an aider and abettor (accessory) under § 556.170. In closing arguments the state repeatedly argued that because the decedents had been shot in the back and defendant was the only one in a position to do so, it was defendant who had fired the pistol and thereafter tossed or handed it to Goines who was seen by Gammage to be holding the smoking weapon. The importance of the state's theory and the fashion in which the cause was presented to the jury via instructions will become evident when we consider defendant's claim that he is deserving of a new trial because of the suppression of evidence favorable to him.

In the motion for new trial defendant contended, inter alia, he had been deprived of due process and a fair trial when the state withheld or suppressed evidence tending to prove that defendant did not do the actual shooting and that the bullets entered the bodies of Curtiss and Glanton in the stomach and chest and not in the back. Instead, so the motion alleged, the prosecuting attorney, in disregard of the withheld or suppressed evidence, knowingly questioned Deputy Sheriff Cole so as to create the false impression that defendant had shot and killed Curtiss and Glanton from the back. Affidavits of defendant, defendant's counsel, Dr. Harvey E. Nickels and Deputy Sheriff Cole were attached to and made a part of the motion. In substance, the affidavit of the deputy sheriff stated "that he has proof by way of balistic [sic] and chemical tests that [defendant] did not fire the weapon used in killing [Curtiss and Glanton and] that it is his opinion that [defendant] did not fire the weapon used in said killings." Dr. Nickels in his affidavit stated "that he examined the bodies of [Curtiss and Glanton] in September of 1972 [and] that from his examination and observation . . . the bullets entered the bodies of both M. C. Curtiss' left side and Robert Glanton from the front." The affidavit of defendant's counsel related "that he went to the Prosecuting Attorney's office before the trial of said cause and requested all medical reports and other scientific tests, if any, in regard to the defendant and the two victims, and while the Prosecuting Attorney stated that he would give the defense attorney all of his reports, the report of Dr. H. E. Nickels was not given to the deponent." Counsel's affidavit concluded with the assertion that "throughout the preliminary hearing and investigation of this case, there was no indication by the Prosecuting Attorney . . . that he would try to prove . . . that the defendant . . . actually fired the weapon . . . but to the contrary indicated that his only proof was that another person did the actual shooting." Defendant's affidavit more or less aped what has already been said by the others.

 Defendant's new trial motion and accompanying affidavits were interlaced with asseverations that the evidence sup-

pressed by the state not only denied him due process and a fair trial but likewise was evidence newly discovered by defendant and his counsel. Albeit true that non-disclosure cases and those wherein a new trial is sought because of newly discovered evidence must take somewhat different paths to reach success, we do not grant the state's contention that the allegations as to newly discovered evidence destroyed the other parts of the motion regarding non-disclosure or dissipated them as a preservative of defendant's point on appeal that the trial court erred in failing to grant a new trial because of the evidence suppressed by the state. Using variable standards, virtually all cases recognize that to vitiate a conviction for nondisclosure when requested, the suppression must work to the harm and prejudice of the defendant. 34 A.L. R.3d 16, Anno., Withholding Evidence—By Prosecution, § 10, pp. 68–71. Consequently, if the nondisclosed evidence was not also newly discovered to defendant after trial, he would experience difficulty in showing harm and prejudice. The two theories are not incompatible or self-destructive. From the affidavit of defense counsel that although he requested all medical reports from the prosecutor, "the report of Dr. H. E. Nickels was not given to" him, we believe it permissible to infer that the prosecutor did, in fact, have such a report, and it requires no great imagination to realize that in a case of this notoriety the prosecutor kept abreast of all developments and was fully aware of all facts and opinions possessed by Deputy Sheriff Cole. It is common knowledge and to be presumed that an officer and agent of the law would officially report to the proper authorities the findings of his investigations, tests and examinations relative to the accused's connection with the crime charged. State v. Miller, 360 S.W.2d 633, 637[9] (Mo.1962). Therefore, if the prosecutor, as distinguished from other agents of the state, must have personal knowledge of the matters allegedly suppressed (see comment, supra, 34 A.L.R.3d 16, § 12, at pp. 74–75) we feel the evidence and circumstances herein were sufficient to show such knowledge. Likewise, we do not agree with the state that the affidavits submitted with the new trial motion should be ignored because (1) they were not in proper form and (2) did not prove themselves. The form followed is that illustrated in 6 Missouri Practice, Affidavits, § 82, p. 43, and was proper. The affidavits were not offered as substitutes for evidence (sans stipulations) in the trial of the cause, hence Eames v. Eames, 463 S.W.2d 576, 579[2] (Mo.App.1971), cited by the state is not controlling. Moreover, whatever objections the state may have had to the affidavits (Rules 27.20(a) and 31.04) were waived when the state failed to file counteraffidavits or proffer contrary evidence. The uncontradicted affidavits made a prima facie showing of their contents [Thorn v. Cross, 201 S.W.2d 492, 496[4] (Mo.App.1947)], and could be considered by the trial court and this court as competent evidence for the purpose of the new trial motion. Hoelscher v. Sel-Mor Garment Company, 430 S.W.2d 745, 747[2] (Mo.App.1968).

In Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–1197, 10 L.Ed.2d 215, 218[3] (1963), it was held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Perhaps overoptimistically the Missouri Supreme Court stated in State v. Cannon, 465 S.W.2d 584, 587 (Mo. banc 1971), that "situations calling for the application of the Brady rule will not likely occur in this state in the future as the Code of Professional Responsibility (S.Ct. Rule 4) [DR 7–103(B)], which became effective January 1, 1971, contains the following provision: 'A public prosecutor or other government lawyer in criminal litigation *shall make timely disclosure* to counsel for the defendant, or to the defendant if he has no counsel, of the existence of evidence, known to the prosecutor or other

government lawyer, that tends to negate the guilt of the accused, mitigate the degree of the offense, or reduce the punishment.'" (Our emphasis). Under this last quoted rule, as well as others, "It is not simply [the] duty [of prosecuting attorneys] to obtain convictions, but to see that justice is done." State v. Brooks, 513 S. W.2d 168, 174[11] (Mo.App.1973).

■ Taken as a whole, it cannot be seriously disputed that the state's evidence and arguments gave the jury the impression that defendant shot Curtiss in the back and chest and shot Glanton in the back while holding and firing the pistol a distance of 18 to 24 inches to the rear of Glanton. Neither can it be seriously disputed that if the results of Dr. Nickel's examination of the bodies and the results of the chemical tests known to the deputy sheriff had been revealed to the defendant and the jury, the trial could have terminated in a different conclusion. Ordinarily on the basis of newly discovered evidence alone, to secure a new trial the defendant must generally show that the newly discovered evidence would *probably* result in his acquittal. "The standard of materiality applied under the *Brady* rule is clearly not this high: something less than the probability of a different result suffices. . . . In the *Brady* cases . . . the courts see greater unfairness, and therefore require a much lesser showing of harm, apparently because the unavailability of the evidence resulted from the action or inaction of the state." Comments, Brady v. Maryland and the Prosecutor's Duty to Disclose, 40 U.Chi.L.Rev. 112, 121–122 (1973). Withholding by the prosecution of a portion of the knowledge of a state's witness [Alcorta v. Texas, 355 U.S. 28, 78 S. Ct. 103, 2 L.Ed.2d 9 (1957)], and its conveyance of incorrect or misleading information to the defendant [State v. Napolis, 436 S.W.2d 645, 649[7] (Mo.1969)] results in the accused not being afforded due process of law. Nondisclosure by the state of a part of the deputy sheriff's knowledge of the chemical tests and of the result of the examining physician's findings was of such a nature that without disclosure the defendant's trial could be viewed as fundamentally unfair. State v. Aubuchon, 381 S.W.2d 807, 814[9] (Mo.1964). When this nondisclosure was compounded by the state's nonrevealing arguments, supra, defendant was placed "in a constitutionally unfair position." State v. Thompson, 396 S.W.2d 697, 702–703[6] (Mo. banc 1965).

■ The foregoing is not to say we cede defendant's point "that the evidence was insufficient to support a conviction of murder in the first degree." Should the nondisclosed evidence now complained of be revealed to a jury together with that hereinbefore recited, it is still within its particular province to find the facts and determine the testimony it chooses to believe. State v. Stroud, 362 Mo. 124, 127, 240 S.W.2d 111, 113[3] (1951). In other words, should the jury place no credence in the chemical test or fail to accept the examining physician's opinion, there still remains evidence which would justify a finding of defendant's guilt as the principal and actual perpetrator of the murder. Also, further analysis is unnecessary to demonstrate that the jury, even though it found defendant had not fired the pistol, could reasonably find a concert of action or a conspiracy, so to speak, between defendant and Goines which would render defendant guilty as a principal in the second degree or accessory before the fact under § 556.170. Our decision to reverse and remand is predicated upon the nondisclosure of evidence by the state and, as the other errors complained of will not likely occur upon retrial, they need not be determined or decided at this time.

The judgment nisi is reversed and the cause remanded for a new trial.

All concur.