**STATE of Missouri, Plaintiff-Respondent,**

v.

**Johnnie Lee BROOKS, Appellant-Defendant.**

**No. 34852.**

Missouri Court of Appeals,
St. Louis District,
Division Two.

Dec. 27, 1973.

Motion for Rehearing or Transfer to Supreme Court Denied Feb. 11, 1974.

Application to Transfer Denied
May 8, 1974.

Richard C. Wuestling, III, Wayne B. Wright, and Don R. Wintermeyer, St. Louis, for appellant-defendant.

John C. Danforth, Atty. Gen., G. Michael O'Neal, David Robards, Asst. Attys. Gen., Jefferson City, Brendan Ryan, Henry Fredericks, and Thomas C. Muldoon, St. Louis, for plaintiff-respondent.

SMITH, Presiding Judge.

Defendant appeals from his convictions by a jury of assault with intent to maim with malice, and robbery in the first degree. The court found defendant to be a second offender and sentenced him to 55 years on the assault charge and 15 years on the robbery charge, to run concurrently.

The assault charged was the vicious, detestable and unprovoked blinding of a seventeen year old girl, Wilma Chestnut. The crime and subsequent trial of defendant generated considerable press coverage, both locally and nationally. Defendant raises eight claims of error.

■ Since one of those claims is the lack of substantial evidence to support the verdicts, we review the testimony in the light most favorable to the State. On September 23, 1971, defendant in the company of three other persons went to visit Miss Chestnut at her cousin's apartment where she was babysitting. One of the defendant's companions, Ronald Clower, was known to Miss Chestnut. The other two companions were Ernest Crain and Earl Harper. Crain, Harper and Brooks were unknown to the victim. Crain and Harper identified themselves by aliases; Brooks used his proper name. Following this initial meeting all four men left. Crain, Harper and Brooks discussed returning and stealing from the apartment a television and tape deck which they had observed. These three then returned and were admitted to the apartment by Miss Chestnut. There is considerable discrepancy between the testimony of Miss Chestnut and Earl Harper as to the number of times the three

were in the apartment and who left and reentered the apartment during the afternoon. As with other inconsistencies in the record, it is unnecessary to discuss these discrepancies, other than to note they existed. Eventually, Brooks grabbed Miss Chestnut around the neck and choked her, and Earl Harper put his hand on her face. She fainted. Brooks, Harper and Crain then took a record player and tape deck and left the apartment. Harper testified that, upon reaching Brooks's car, he and Crain entered the car and Brooks stated he was going back up and would meet them later on a nearby street. Shortly thereafter Brooks met the other two and Harper observed blood upon Brooks's hand. In response to an inquiry by Harper as to whether he had killed Miss Chestnut, Brooks responded:

"You know that glass I was drinking water out of? . . . Well, I took it in the bathroom and broke it and stabbed her eyes out . . . Won't nobody be bothered. She don't be looking at no pictures."

Miss Chestnut remembered nothing after being choked until she regained consciousness and was unable to see. Both eyes were cut and the prognosis for any return of vision is very poor. Crain has not been located since the occurrence and did not testify. Miss Chestnut testified that the man introduced to her as Johnny Brooks was the man who choked her, although there was evidence that the verbal description she gave more closely fitted Crain than Brooks. Clower testified that the man he introduced as Brooks to Miss Chestnut was the defendant. Brooks presented an alibi defense.

■ If believed by the jury, the testimony of Clower, Miss Chestnut and Harper was sufficient to support a verdict against defendant on the robbery charge. If believed, the testimony of Harper was sufficient to support a verdict against defendant on the assault with intent to maim charge.

■ Defendant attacks the court's refusal to order police officers to be interviewed by defendant's counsel in the absence of representatives of the prosecutor's office. Defendant took the depositions of these officers (or waived the taking in one case) so there is no prejudice shown. The same is true of defendant's claim that the court erred in denying his motion to require the State to pay the cost of depositions. Defendant points to no witness whose deposition he did not take because of expense. It appears that defendant's appointed counsel bore the expense of depositions on behalf of defendant, and whatever hardship was engendered was to counsel, not defendant.

■ Defendant also contends that, although Rule 24.04, V.A.M.R. authorizes joinder of two distinct felonies in one indictment, it does not authorize conviction on both offenses. State v. Johnson, 499 S.W.2d 371 (Mo.1973) approves conviction on both offenses charged jointly under Rule 24.04. The joinder was not improper here. The rule authorizes joinder of two or more offenses, even though separate and distinct " . . . which are based on the same act or on two or more acts which are part of the same transaction or on two or more acts or transactions which constitute parts of a common scheme or plan . . . ." The blinding of Miss Chestnut was, under the State's evidence, to prevent her identification of the robbers. Both crimes were part of a common scheme—the robbery.

We turn now to the more serious points raised by defendant. Although delineated as four points, they can be summarized as (1) a lack of due process because of the failure of the State to make discovery and (2) the erroneous refusal of the trial court to give a cautionary accomplice instruction when requested.

As the State admits in its brief: "The only testimony implicating the appellant in [the] assault is Harper's." Although corroborated as to the robbery, it was also the

primary evidence establishing defendant's participation in that crime. Harper was sixteen at the time of trial. Following his arrest he was processed under the juvenile code and certified by the judge of the juvenile court to stand trial as an adult. He was charged by indictment with exactly the same offenses as defendant, both crimes carrying a maximum sentence of life imprisonment. He retained a lawyer, Gerald Rabushka, to represent him. On January 10, 1972, (more than four months prior to Brooks's trial) Mr. Rabushka and Henry Fredericks, the special prosecutor handling the Brooks's case, discussed Harper's situation.

Mr. Rabushka's testimony concerning this meeting given at the hearing on defendant's motion for new trial, was:

"Mr. Fredericks stated that he desired Earl Harper to testify in the case against Johnnie Lee Brooks, and told me that all charges against Mr. Harper would be dropped immediately prior to any testimony. He thought that he would have to do this in order for Mr. Harper to testify, and he said that after Harper testified, that the Circuit Attorney's Office would then reinstate the stealing charge so as to process him; and indicating to me, further, that if Mr. Harper would then plead guilty to the stealing charge, that he would receive probation."

Mr. Fredericks's recollection of the conversation was:

"Well, I don't know whether or not the charges would be dropped. If he is on the same file, if I understand the law, the charges would have to be dropped for him to testify; but I don't know how Ryan [the Circuit Attorney] will look at that."

On January 11, 1972, Earl Harper (as well as 10 other persons) was endorsed as an additional witness in the Brooks case.

On April 6, 1972, immediately prior to the deposition of Earl Harper (taken by defendant's attorney) Mr. Rabushka and Mr. Fredericks had another conversation regarding Harper's testimony.

Mr. Rabushka's testimony was:

"This took place immediately prior to Mr. Harper's deposition, and the discussion again was that the robbery and the maiming charges would be dismissed; that in place of the robbery charge, an assault charge would be substituted; that the Circuit Attorney's Office would recommend one year in the Workhouse, and that they would also recommend probation . . . ."

Mr. Fredericks recalled the meeting as follows:

"I believe the first thing I said was, 'I hope he testifies in deposition.' That was the first thing I said. And secondly, I believe I said, 'Well, we will soon find out.' And then, there was some conversation as to the charges against him, and I told Mr. Rabushka that I would recommend to Ryan that *if he testifies in deposition, the way that I understand that his testimony would be,* then under the law and under the facts of the situation, I would recommend that the assault charge be dropped and that the defendant be permitted to plead on assault with intent to rob . . . It was only the defendant Brooks who went back in; and on that basis, I told him, 'I hope he testifies. There is one way to find out: *let's go down and see if he testifies, as I believe he will;* then I will recommend that the assault charge be dropped.'" (Emphasis supplied).

Mr. Rabushka testified that Fredericks promised his client probation on both January 10 and April 6. Mr. Rabushka testified he did not inform Harper of these conversations but told Harper's mother and stepfather on several occasions.

During Harper's deposition, with Rabushka and Fredericks present, Harper was questioned extensively about any deals offered for his testimony or any discussions

of reduction of sentence or of immunity. Harper answered negatively. Mr. Fredericks made no correction of the testimony and at no time thereafter advised defendant or his counsel of his discussions with Rabushka.

Prior to Harper's testimony before the jury, the court held a hearing outside the presence of the jury to determine Harper's competency to testify in view of his status in being charged with the same crimes as Brooks arising out of the same transaction. Fredericks advised the court that Harper was charged with the same crimes as Brooks. The court examined Harper extensively concerning his understanding of his rights and the waiver of those rights by testifying. Harper testified he had discussed the legal effects of his testifying with his attorney; that he understood his testimony could be used against him in the case pending against him; that he had discussed these same matters with his attorney before his deposition; that he had talked with his parents prior to trial and prior to the deposition and they knew he was going to testify. No indication was given to either the court or defendant's counsel by Harper, his attorney or Fredericks of the prior discussions between Fredericks and Rabushka. A review of the transcript of this hearing can only lead to the conclusion that it reinforced Harper's testimony at deposition that no deals had been made and that he would be tried for the offenses with which he was charged.

Brooks trial concluded on May 26, 1972, a Friday. Monday was a holiday. On Wednesday, May 31, Harper appeared in court. The State dismissed the robbery charge against Harper and reduced the assault charge to one of intent to maim without malice (which carries a five year maximum sentence. Sec. 559.190, R.S.Mo.1969, V.A.M.S.). Harper pleaded guilty, was sentenced to one year in the City Workhouse; sentence was suspended and he was placed on probation.

■ Defendant relies upon Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L. Ed.2d 1217 (1959); Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). We can add to that list State v. McClain, 498 S.W.2d 798 (Mo. banc 1973). All are premised upon the established doctrine that a conviction obtained by known false testimony cannot stand because it involves a lack of due process. We believe, however, that Napue, Giglio and McClain reach beyond the element of known false testimony into an area particularly apposite of this case. Courts have traditionally been cautious of convictions obtained upon the uncorroborated testimony of persons who have participated in the crime. Missouri has recognized that such convictions are authorized but has always required that, where requested, the jury be warned of the suspect nature of such testimony. State v. Burks, 484 S.W.2d 302, 1. c. 304 (Mo.1972). Additionally, of course, all juries, including the one in this case, are given a credibility of the witnesses' instruction. But for a jury to assess the credibility of a witness, it must be aware of facts which might cause a witness to be less than fully truthful or untruthful. The determination of that credibility is solely within the province of the jury and it is entitled to any information which might bear on that credibility.

■ Human experience also teaches that the opportunity to rid oneself of punishment for wrongdoing is a powerful incentive to fabrication, even where the opportunity is presented only if the testimony implicates another. Promises of immunity from prosecution, reduction of charges, reduction of punishment, and dismissal of charges are common methods of obtaining testimony implicating persons other than the witness. This is not to say that testimony obtained by such promises is always untrue or even usually untrue, but human experience teaches that it is always sus-

pect. Whether such promises have been made is an important fact which a jury must have to evaluate the testimony. And the important consideration is not whether a promise or agreement has been made or whether it is carried out, but whether the witness believes or has reason to believe that if he testifies in a particular manner he will receive more favorable treatment.

As the judicial process has developed from its "sporting contest" aspect into its present "quest for truth" aspect, the courts have recognized that access to information in the hands of the opposing party is vital to the proper functioning of the process. Increasingly, the right of litigants to discovery of such information is enforced by the courts. As recently as October 9, 1973, the Supreme Court of this State adopted broad and extensive rules for discovery in criminal cases.

█ We must also recognize that incentives to testify are normally the product of discussions between prosecuting officials and the witness or his counsel. For ethical reason the witness's counsel is not free to reveal such discussions to defendant's counsel and witnesses cannot always be trusted to answer honestly when questioned on deals or promises made to secure their testimony. Prosecuting attorneys, however, occupy a different position. It is not simply their duty to obtain convictions, but to see that justice is done. They are bound to make "timely disclosure to counsel for the defendant, or to the defendant if he has no counsel, of the existence of evidence, known to the prosecutor or other government lawyer, that tends to negate the guilt of the accused, mitigate the degree of the offense, or reduce the punishment." State v. Cannon, 465 S.W.2d 584 [1] (Mo. banc 1971); S.Ct. Rule 4, DR 7–103.

█ Suppression of material evidence justifies a new trial irrespective of the good faith or bad faith of the prosecution. Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); Brady v. Maryland, 373 U.S. 83, 84, 83 S.Ct. 1194,

10 L.Ed.2d 215 (1963); State v. McClain, 498 S.W.2d 798 (Mo. banc 1973). "When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within this general rule." State v. McClain supra at 800 quoting from Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). The obligation of the prosecutor to make disclosure is not changed because the crime is heinous, the public outrage is great, or the press pressure for a conviction is substantial. The special circuit attorney here apparently thought it was.

█ The experienced trial attorney representing defendant was entitled to rely upon the negative responses of Harper in his deposition under oath, uncorrected by the prosecutor, that no promises or deals had been made. In Laws v. City of Wellston, 435 S.W.2d 370 (Mo.1968) and Thomas v. Fitch, 435 S.W.2d 703 (Mo. App.1968), Missouri courts have recognized a continuing obligation to make discovery. Depositions in criminal cases are conducted in accord with the Civil Rules of Procedure. See Rule 25.11 V.A.M.R. Defendant's attorney conducted his cross-examination of Harper in reliance on the continuing accuracy of Harper's testimony at the deposition that there had been no promises to Harper. That testimony was not true at the time of the deposition, nor at the time of trial and the prosecutor, who offered the deal, knew it. We cannot even conclude the failure to disclose was inadvertent and, since both Napue and Giglio had been decided, it should not have been based on any misapprehension of the law. We can only conclude that the failure to disclose was a knowing, calculated attempt to foreclose defendant from eliciting relevant testimony and to keep the jury from having facts upon which to base its determination of Harper's credibility and therefore of defendant's guilt. Defendant's conviction cannot stand in the face of this denial of due process.

The State contends that no deal had actually been made, that negotiations contin-

ued until after Brooks's trial. The only negotiations were whether Harper would plead to the lesser assault charge or a stealing charge. The dropping of the two life sentence charges and the punishment to be recommended (probation) had been agreed upon. Additionally, this argument does not deal with the vice of the procedure here. The question for the jury to determine, and upon which it is entitled to the facts, is whether the testimony of the witness is shaped or created by a belief that that testimony will gain him more favorable treatment than he would otherwise receive.

Nor can we place credence in the argument that Mr. Rabushka testified he did not advise Harper of his conversations with Mr. Fredericks. He did advise Harper's parents and they did discuss with Harper his testimony before deposition and trial. The record does not support the conclusion that Harper was unaware of the deal. But this argument too misses the mark. Nothing in the record indicates the prosecutor believed Harper was unaware of the deal offered and all logic would make him believe Harper did know. The denial of due process and of a fair trial here is the intentional refusal of the prosecutor to disclose a proffered favorable disposition of Harper's indictments in return for his testimony.

■ Defendant offered two instructions, alternatively, cautioning the jury concerning accomplice testimony. Both were refused. The State makes no attack on the instructions as to form or substance. Rather the State takes the position that Harper was not an accomplice as to the assault charge and that, although he was an accomplice in the robbery, his testimony was corroborated. Harper was charged at the time he testified with exactly the same crimes as Brooks. The State justifies joining both charges against Brooks in one indictment because the assault was to prevent Miss Chestnut from identifying the robbers and therefore was a part of the common scheme or plan to rob Miss Chestnut. Defendant was charged with committing the assault and the robbery "while acting with another."

"An 'accomplice' is 'one who knowingly, voluntarily, and with a common interest with others participates in the commission of a crime either as a principal or as an accessory before the fact.'" State v. Martin, 428 S.W.2d 489 [1–3] (Mo. 1968).

By his own admission Harper was a participant in the robbery and under the State's own theory was responsible for any other crime committed by any participant in the course of committing that crime. State v. Tolias, 326 S.W.2d 329 [5, 6] (Mo.1959); State v. Paxton, 453 S.W.2d 923 [1, 2] (Mo.1970).

Where an accomplice instruction is requested and the facts warrant giving it, the refusal to do so is reversible error. The instruction should have been given. State v. Burks, 484 S.W.2d 302 (Mo.1972); State v. Woolard, 111 Mo. 248, 20 S.W. 27 [3] (1892).

We need not discuss defendant's other points for the material which he claims should have been disclosed before or during trial is now available to his counsel for use at retrial.

■ For some the decision we here render will be an example of "permissiveness" and lack of concern for the public by the judiciary. But no matter how heinous the crime, the fact of its commission alone cannot establish the guilt of the defendant. No matter the seriousness of the crime, the defendant on trial for its commission is entitled to a fair trial in which the jury has before it the facts upon which to make a reasoned and intelligent decision. When those facts have been suppressed by the State, the defendant has received an inquisition, not a trial. We cannot and will not permit our system of justice to be so perverted.

Judgment is reversed and the cause is remanded for new trial.

CLEMENS and McMILLIAN, JJ., concur.