STATE of Missouri, Plaintiff-Respondent,

v.

Edward Eugene COLLETT, Defendant-Appellant.

No. 35980.

Missouri Court of Appeals, St. Louis District, Division Three.

Aug. 12, 1975.

William J. Shaw, Public Defender, Howard Schainker, Dennis Neil Smith, Asst. Public Defenders, Clayton, for defendant-appellant.

John C. Danforth, Atty. Gen., Preston Dean, Paul Robert Otto, Asst. Attys. Gen., Jefferson City, Courtney Goodman, Pros. Atty., George Westfall, Sam C. Bertolet, Asst. Pros. Attys., Clayton, for plaintiff-respondent.

SIMEONE, Presiding Judge.

## I

### Introduction

This is an appeal by the defendant-appellant, Edward Eugene Collett, from a judg-

ment of conviction entered January 18, 1974, by which the appellant was sentenced by the court to the department of corrections for the offenses of robbery in the first degree by means of a dangerous and deadly weapon and assault with intent to do great bodily harm with malice. §§ 560.120, 559.-180, RSMo 1969.

Appellant was charged in Count I of an amended information with robbery, first degree and in Count II with assault with intent to do great bodily harm with malice; he was found guilty by a jury on both counts, and the court, having found the Second Offender Act, § 556.280, RSMo 1969, applicable, sentenced the appellant to two thirty-year terms to run consecutively. He appeals. For reasons hereinafter stated, we affirm.

Appellant does not challenge the sufficiency of the evidence, so that only those facts necessary for the disposition of the points raised on this appeal need be stated.

## II

### The Facts

A jury could reasonably find the following: Reverend Emmett Louis Glenn, an ordained minister, in his spare time assisted his son, Donald, at his son's Shell Service Station, located at 13090 Tesson Ferry Road in St. Louis County. On the evening of March 3, 1970, Rev. Glenn was working alone at the station office. At about 8:00 p. m., a Chevrolet pickup truck pulled into the service station near the entrance to the office. The passenger side faced the office. Rev. Glenn saw the truck pull up as he was seated at the front desk facing a window overlooking the parking area. He was seated at the desk, writing out work orders. There were three persons in the truck. Rev. Glenn noticed that on the side of the truck were the words "Dittmer, Missouri." Two of the men, identified as the defendant and Michael Wells, came into the office, and

one asked where they could "get a sandwich." The third man, James Poirrer, crossed in front of the office and went to the other side of the building where there was a soda machine. While the defendant and Wells were talking, Rev. Glenn had "eye contact" with them. One of the men, identified by Rev. Glenn as the defendant, complained about having a pain in his abdomen. "He kind of bent over and when he raised up he had a gun in his hand. He said: This is a stick up. You get that register open and you get that register open in a hurry." Glenn opened the register, and Collett commanded Wells to "take the money out." Wells took the "bills" from the register—about $182.00. Glenn was then taken "around the back," "out through the side door past the cash register and around to the back." The side door led to a "bay" area and to the "stock room." At trial, accounts of Glenn and Wells differed as to who took Glenn to the stock room. Wells testified that both he and the defendant began to accompany Glenn to the stock room, but that Wells went to wait on a customer who had pulled into the station. Glenn indicated that Wells led him to the stock room holding something to his back. According to Glenn, while he was in the stock room, both Wells and Collett had a gun, although Wells denied he had a gun. Collett entered the stock room and said, "What have you got this guy standing up for. Get him on the floor." Collett then ordered Glenn to lie on the floor. Possibly a minute later, the third man, James Poirrer, came in and "shouted to the other two men in the stock room the police has been alerted. We have got to get out of here." Collett then told Glenn to put his head down. "He was close to me standing over me." Then "I was hit in the face on the right side." "Next thing occured [sic] I was hit on the back of the head." "Then I was hit a third time and I heard a sound like the firing of a gun and I went completely out." The whole time that Collett was in the back room he had "a gun in his hands." Glenn's ear was "practically cut off," and he spent

some nine days in the hospital. From the time that the gun was pulled in the office to the time Glenn got to the back room, "a minute; maybe two minutes; somewhere in that time limit" elapsed. Glenn's wallet was also taken from him.

While Glenn was in the back room, a customer, Raymond Knittig, whose father owns a bowling alley across the street from the service station, pulled in for oil. Wells waited on him but did not know how to put the oil in the engine or how much it cost. Knittig told Wells he wanted two cans and told him he thought it cost $.40 a can. He gave Wells a $10.00 bill. While Wells waited on Knittig, Poirrer waited on another customer. Wells went to the stock room to get change. After receiving his change, Knittig left. Wells then got into the truck and tried to start it. "And I heard what I thought was a shot. Next thing I knew both [Poirrer and Collett] went out to the truck and both got into the truck." Wells asked Collett, "Did you shoot him?" and Collett replied, "No, the gun discharged when I hit him."

The three then went to Collett's house and divided the money and the contents of Glenn's wallet, which had been taken from him.

Some minutes after the robbery, Officer Thomas Gilyon of the St. Louis County Police Department received a radio dispatch and proceeded to the Shell station. When he arrived, Rev. Glenn was bleeding. Soon Patrolman George Ice and Detective Marvin Phelan also arrived. Rev. Glenn gave them a description of the three men and of the pickup truck (a "light green") and then was taken in an ambulance to the hospital. Other officers came, and photographs were taken. The next day, Patrolman Ice showed Glenn some photographs, but he was not able to identify anyone from the photos. On two separate occasions following Glenn's release from the hospital, he was shown a number of photographs. On the second occasion, March 20, 1970, Officer

Jimmie Kitterman of the police department of the City of St. Louis went to Glenn's home and showed him six photographs, and Glenn identified Collett. Glenn stated that there was no doubt in his mind that Collett was the "one who came in first with the gun."

At trial, during direct examination, the prosecutor asked Officer Kitterman:

"Q. When you went to see him did you have something to show him?

A. Yes.

Q. What?

A. Photographs.

Q. About how many?

A. Six.

Q. Was Mr. Collett's photograph one of those?

A. Yes, it was.

Q. Did Mr. Glenn have anything with regard to that photograph to say to you?

A. Yes. He positively identified—"

Then the following occurred:

"[Defense counsel]: Your Honor, I will object to anything somebody else said as being hearsay.

THE COURT: Sustained.

[Prosecutor]: Okay. Now that was the same day that you arrested Edward Collett?

* * * "

That same evening, March 20, about an hour later, Officer Kitterman and Detective Chester Kell went to the home of Mr. Collett's mother, Mrs. Edith Kotura, where Collett was staying. They waited for Collett. In time, he drove up in a red and white pickup truck, came toward the house and for "unknown reasons he broke and ran." The officers gave chase; Collett returned to the house through the back door and was arrested in the kitchen. The pickup truck was parked outside, and later po-

lice photographers took pictures of it. Officer Kitterman identified the name of "Dittmer, Missouri" on the side of the truck. Later that evening, Kitterman took Glenn to see the truck. Glenn said that the truck was the truck that "drove up that night." [1]

The next day, Rev. Glenn viewed a lineup and recognized Collett as the "man that pulled the gun on me and robbed me" and as the one who told him to put his head down in the back room. At the time of the lineup, however, Glenn indicated that Collett had a "crew cut" which was different than at the time of the robbery, since it was "medium length" and "combed."

On April 1, 1970, Officer Leo Burle, of St. Louis County, arrested James Poirrer, and on April 2, 1970, Michael Wells surrendered at St. Louis County Police Headquarters, being brought there by his father. Wells signed a statement.

One of the principal witnesses against Collett was Michael Wells. Wells testified that he and Poirrer had been in a tavern during the afternoon of March 3, and drank a number of beers. They then went to a restaurant at Grand and Arsenal, where Collett's wife worked and where he would often see Collett. At the restaurant, they met Collett. At about 4:30 p. m. the three left in Collett's truck, and at about 8:00 p. m. they stopped at the Shell station. Poirrer and Collett got out of the truck, and Wells stood at the doorway. Wells said he saw Collett pull a gun on Glenn and tell the man to open the cash register, and he "instructed me [Wells] to take the money out. I did that." Wells testified that he and his father went to the police department about a month after the robbery and told his story. On direct and on cross-examination,

Wells testified that he pleaded guilty to robbery with a dangerous and deadly weapon and received a three-year probation. While he was in jail, his lawyer suggested that, while there were no promises or guarantees, if he agreed to testify against Collett he might get probation or it would be helpful "with regard to what the Judge would do . . . ." He was in fact put on probation in March, 1973. He was never told that he would not make probation if he did not come in and testify against Collett. He admitted he had been sentenced and that he was on probation. On recross, defense counsel indicated the "whole deal" had been pretty nice for you [Wells]. "You have confessed to an armed robbery and beating an old man and you are still walking the streets?" At trial and on cross-examination, Wells stated that there had been no promises or guarantees made to him in return for his testimony against Collett.

The defendant's defense was essentially an alibi and an attempt to discredit the testimony of Wells and Glenn. The defense admitted that a robbery had taken place and that Glenn was assaulted but contended that Collett was not the person who participated therein. The defendant's wife, Viola, testified that she married Collett in December, 1969, and that she worked as a waitress for the Courtesy Restaurants. She testified that her husband always had dinner with her from seven to eight o'clock each and every night since they were married. She testified that on the evening of March 3, 1970, she and her husband had dinner at the restaurant where she was working—18th and Olive—that they finished dinner at 8:00 p. m., that Collett played the pinball machine until about 9:00 p. m., left, and that he returned to pick her up at midnight.

1. At trial, there was considerable testimony concerning the truck. Glenn had stated it was light green or blue; the truck was red and white. Glenn indicated it had lights on top of the cab; several defense witnesses testified that Collett's truck with the name "L. Lewis" "Dittmer, Missouri" did not have lights, and always had a tool box behind the cab, which the photograph of the truck parked at Collett's house failed to show. Glenn stated that he was color blind and could not easily distinguish colors. Where conflicts in the evidence exist, the matter is for the jury to determine. *State v. Nolan*, 499 S.W.2d 240, 250 (Mo.App.1973).

Viola also testified that sometime prior to March 3, 1970, Wells and Collett had gotten into a fight at a restaurant where Viola was working and that as Wells left he vowed he would "get even . . . one way or the other." She also testified that on the evening of March 19, 1970, Wells came into the restaurant and told Viola that "he had fixed Butch's [Collett's] wagon"—he said he had "pulled an armed robbery and he had let the police know my husband was the one that done it." That is why Viola and Collett went to his mother's home later that night.

Viola explained the reason that Collett "ran" on the evening of March 20—the night he was arrested. She testified that she was in the truck when they pulled up to Collett's mother's house and when she saw a "stranger" at the window she thought it was Wells or Poirrer and not the police. And when Collett returned to the house after running and was told it was the police, he said, "Well, we will wait for them."

The remainder of the defendant's case consisted of impeaching Wells and Glenn. The defendant's mother and his sister both testified that he always had a crew cut and that sometime in April, Wells came to the house and said, "I'm Mike Wells. I'm the one who was in the burglary or armed robbery, whatever, in the service station out in the County. And I want you to know Ed was not with me . . . . [B]efore I let your son go to prison I'll tell the truth." Wells explained this by indicating he had done this at the request of Collett.

The defense also introduced the testimony of Mr. Les "Papa" Lewis, his wife and daughter. Mr. Lewis testified that sometime in May or June, 1970, while having dinner with his family at a restaurant, Wells came over to his table, introduced himself as knowing him "from Butch" and

stated that he had to go to court the next day in regard to the robbery—"the one where I almost beat that man to death." According to Lewis,[2] Wells said he was not worried because "I think he said his stepfather was the prosecutor in the case." Mr. Lewis had never before met Wells, although he and his family knew Collett for some six or seven years.

Much testimony was devoted to the color and style of the pickup truck, to the description of Collett—his weight, color of hair and eyes—and to the length or shortness of his hair. Defense testimony differed in some particulars from the state's witnesses.

The court gave a number of instructions. The court instructed the jury as to robbery in the first degree by means of a deadly and dangerous weapon under Count I (Instruction No. 6) and instructed on assault with intent to do great bodily harm with malice under Count II of the amended information (Instruction No. 8). The court also gave Instruction No. 11, which told the jury that if it did not find the defendant guilty of assault with malice then it must consider whether he was guilty of assault without malice.

During defense counsel's closing argument, which brought out a number of inconsistencies and questioned the credibility of Wells, defense counsel stated, "What we know about the nice boy, Mike Wells is he is on probation. That was the only thing he has ever done. . . . He has entered a plea of guilty to armed robbery, a very serious crime in this State." "Why did he do it? Number One: He sought revenge. . . . The second was to make himself a pretty nice deal . . . Boy, they treated him great." ". . . He was put on probation after having confessed to armed robbery and all of the crimes in the interim. How is it that man is loose on the street?

2. Although the truck had the words "L. Lewis" on it, Les "Papa" Lewis had no connection with the truck.

Somebody went to bat for him and that's the reason he came in on Collet [sic] and made up the story on Collet, to help himself and to get even with Collet for a beating he took."

In the second half of the prosecutor's argument, the prosecutor stated that "We are talking about Mr. Wells being a convicted felon. Do you know why? Because he pled guilty to what he did. He came in and pled guilty. . . . You ask yourself why did he get probation? I have no quarrel with it. If you want to assume the State recommended probation you can assume that, if you like. . . ." Defense counsel then stated: "Wait a minute. What is this? Are you saying a deal was made? . . . You said you made a deal and I object. If there has been a deal made, I didn't know about it. This is the first I heard about it. I object and—" He moved for a mistrial. The trial court overruled the objection and denied the motion for mistrial.

On November 16, 1973, the jury found the defendant guilty on both counts, and after the defendant's motion for new trial was overruled on December 20, 1973, the court sentenced the defendant to thirty years on each of the two counts to run consecutively.

### III

### *The Contentions*

On this appeal, the appellant contends that the court erred: (1) "in permitting Officer Kitterman to testify as to Mr. Glenn's out of court identification of appellant from a group of photographs in that said testimony was hearsay and was inadmissible in absence of any impeachment of

identifying witness' testimony," (2) "in failing to grant a mistrial based on the state not disclosing, upon request, the existence of a 'deal' made in exchange for an accomplice's testimony and in allowing the prosecutor to argue credibility on same matter in the state's last portion of closing argument, in that said failure to disclose such evidence denied appellant his right of due process," and (3) in the "submission of Counts I and II, by way of Instructions No. 6, 8, and 11, [which] subjected appellant to multiple conviction [sic] and punishment for a single offense and thereby placed him twice in jeopardy."

### IV

### *Motion to Perfect Transcript*

At the outset, we must dispose of a preliminary matter. On oral argument of this cause before this court, appellate counsel orally, which was later reduced to writing, filed a "motion to perfect transcript" and moved this court to direct the clerk of the circuit court to certify the circuit court record in the case of *State v. [Michael] Wells*, Cause No. 311340, and to make that record a part of the transcript of the present appeal of Edward Eugene Collett. The motion urged us to do so pursuant to Rule 83.03 [sic].[3] As grounds for said motion, counsel in argument indicated we could and should take judicial notice of the records of the circuit court, and in the motion urged us to order up such records because they "clearly indicate that the Prosecuting Attorney . . . presented false evidence at the trial of appellant . . ." In a memorandum in support of the "motion to perfect" filed subsequent to the motion, appellant urges us to grant the motion under Rule 84.03,[4] because the trial record indicates that on April 20, 1971, some

3. Rule 83.03 deals with transfer to the Supreme Court after opinion by the Court of Appeals.

4. ". . . The court may of its own motion, at any time, require the clerk of the

trial court to send up a complete transcript or any portion thereof or any original documents or exhibits."

two years prior to the trial of defendant, (1) Wells was endorsed as a witness against Collett, (2) Wells pleaded guilty to assault with intent to rob and (3) the state amended the charge from robbery with a dangerous and deadly weapon to assault with intent to rob. This, appellant contends, although we are not so clearly persuaded, shows that "some sort of arrangement was made between the state and Michael Wells in exchange for Wells' testimony." Hence, appellant contends we could issue a "writ of Certiori [sic]" to order up the record of the circuit court file of *State v. Wells.*

The state opposes such motion on the ground that we cannot take judicial notice of matters not before the trial court "unless those matters have previously been on file and been made a part of the records of the appellate court." It relies on Rule 81.12(c) —". . . If anything material to either party is omitted from the transcript . . . the parties by stipulation, or the trial court . . . or the appellant court . . . shall direct that the omission . . . shall be corrected . . . . The appellate court may . . . order that a supplemental transcript on appeal shall be prepared and filed by either party or by the clerk of the trial court . . . or the clerk may be directed to send up any original documents or exhibits."

It contends that the Rules contain no provisions for supplementing the transcript

with facts which have not been presented to the trial court from which an appeal is taken, and further contends that while we may take judicial notice of our own records, we cannot take judicial notice of the records in other courts.

Appellant correctly quotes from that portion of Supreme Court Rule 84.03 which reads: ". . . The court may of its own motion, at any time, require the clerk of the trial court to send up a complete transcript or any portion thereof or any original documents or exhibits." Appellant urges, in effect, that the foregoing passage empowers this court to supplement the transcript on appeal with facts and records which have not been presented to the trial court from which the appeal is taken. In support of this position, appellant cites two cases, *Kollmeyer v. Willis,* 408 S.W.2d 370 (Mo. App.1966),[5] and *McDaniel v. Lovelace et al.,* 392 S.W.2d 422 (Mo.App.1965).[6] Yet, an examination of these cases indicates that the various records and papers that were ordered up from the circuit court were properly before that court at trial or were records of entries made by that court at trial. All of the records and files were from prior proceedings in the same cause. Likewise, the case of *Sanderson v. Producers Commission Ass'n,* 241 S.W.2d 273 (Mo. App.1951),[7] which appellant claims presents an analogous situation to the case presently before this court, can be distinguished on

---

5. In *Kollmeyer,* the circuit court set aside a default judgment in favor of plaintiff in the amount of $25,000, arising out of a personal injury action, and subsequently, after trial, rendered judgment in favor of plaintiff in the amount of $22,500. Plaintiff appealed the setting aside of the default judgment. The appellate court noted that the transcript was incomplete in that it did not include several pleadings and papers to which reference was made and which were needed to shed light on the setting aside of the default judgment. Therefore, pursuant to Rule 83.-03 (presently 84.03), the reviewing court directed the circuit clerk to send up the original file in its entirety and ordered that the same be made a part of the transcript on appeal.

6. In *McDaniel,* a question arose as to whether the appeal from a nunc pro tunc order

entered in a declaratory judgment action was taken within the time prescribed by law. The transcript on appeal failed to show the date upon which the circuit court entered the nunc pro tunc order. The reviewing court of its own motion, pursuant to Rule 83.03 (presently 84.03), issued an order directing the circuit clerk to send up a certified copy of the record entry in the trial court showing the entry of the order nunc pro tunc, and the date thereof.

7. In *Sanderson,* the court of appeals became concerned with the nature of the action taken by the circuit court on an appeal from the findings and final award of the Industrial Commission in a workmen's compensation action. The judgment entry of the cir-

the ground that the record ordered up from the circuit court was a certified copy of the judgment of that court in the proceeding appealed from.

Although we are dealing with evidence that was not properly before the trial court below, counsel for appellant in argument indicated that we could take judicial notice of the records of the circuit court. We do not agree. Although we may take judicial notice of our own records, *Hays-Fendler Const. Co. v. Traroloc Investment Co.*, 521 S.W.2d 171 (Mo.App.1975), matters of record in other courts are denied notice. *Kansas City v. Mathis*, 409 S.W.2d 280 (Mo.App.1966); *State v. Moreland*, 351 S.W.2d 33, 37 (Mo.1961).

We deny the appellant's motion to perfect the transcript. We may consider only those matters presented on the record made in the lower court. *Kansas City v. Mathis*, supra, 409 S.W.2d at 288, and cases cited therein.

Rule 84.03 does not authorize the granting of the motion as appellant contends. This Rule authorizes us to require the clerk to send up a complete transcript or a portion thereof or any original documents or exhibits in the case tried before the circuit court and does not authorize us to order up any and all matters that may have some relation to the cause on appeal.

V

*Officer Kitterman's Testimony*

We turn to the merits. As to his first point, appellant argues that the "facts at bar are substantially the same as those contained" in *State v. Degraffenreid*, 477 S.W.2d 57 (Mo. banc 1972). He argues that when "Officer Kitterman was allowed to

testify that he showed the victim, Mr. Glenn, six photographs, and of which Mr. Glenn identified the appellant therefrom, the very same rule of law was violated" as in *Degraffenreid*. The defendant argues that this inadmissible testimony prejudiced him.

With reference to this point, we note that when the question was asked of Officer Kitterman, "Did Mr. Glenn have anything with regard to that photograph to say to you?" and Officer Kitterman stated, "Yes. He positively identified—", an objection was immediately made and sustained. No further reference was made to a statement. Counsel did not request a mistrial. He received all the relief requested. Where appellant has received all the relief requested, he cannot complain on appeal. *State v. Allen*, 429 S.W.2d 697, 699 (Mo.1968).

Furthermore, there was no specific allegation of error as to this point in the motion for new trial. The motion did indicate that the court erred in overruling the continuing objection and motion for mistrial when Officer Kitterman testified to presenting defendant's photograph to Glenn, on the ground that such testimony raised the inference that defendant had a prior police record. But this point in the motion for new trial did not go to the point raised on this appeal that the court erred in permitting Kitterman to testify as to Glenn's out of court identification. This allegation, accordingly, has not been preserved for review. *State v. Lee*, 522 S.W.2d 63, 65 (Mo.App.1975).

But even though not preserved, the statement of Officer Kitterman was not prejudicial error. We recognize that the testimony of an officer that an identifying witness had identified the defendant by means of a photograph is inadmissible absent impeachment of the identifying wit-

---

cuit court was not shown in the record before the appellate court. The court of appeals on its own motion ordered up a certi-

fied copy of the judgment of the circuit court.

ness' testimony with respect to the extrajudicial identification. *State v. Degraffenreid,* supra, 477 S.W.2d at 63. But the admission of such testimony may or may not be harmless error. In *Degraffenreid,* there was only one eye witness, a 78 year old man, and the testimony of the officer corroborating the identifying witness could have tipped the scales against defendant. The police officer there testified in the state's case that the identifying witness identified a photograph of the defendant and identified him in a lineup. We believe *Degraffenreid* is distinguishable and does not control this case. Officer Kitterman never finished the statement. Even if the logical inference is that Kitterman's statement was that "[h]e [Glenn] positively identified" Collett, an objection was immediately made and sustained. No further reference was made to the identification. Furthermore, unlike *Degraffenreid,* Glenn was not the only witness to the affair. While Wells was admittedly an accomplice, he identified Collett as one of the persons who participated in the robbery; the fact that Wells was an admitted accomplice goes to the weight and not the admissibility of his testimony. The limitations of *Degraffenreid* are shown in the concurring opinion of Judge Finch—there are cases where such evidence did not operate to the prejudice of defendant. See also *State v. Kennedy,* 513 S.W.2d 697 (Mo.App.1974). We cannot conclude that the incomplete statement of Officer Kitterman, objected to and sustained by the court, constituted, as in *Degraffenreid,* prejudicial error in the context of this record. In view of the fact that the testimony of Glenn which placed the defendant at the scene of the robbery was substantially corroborated by Wells, we cannot conclude that Kitterman's three-word partial

response could have had such an effect on the jury as in *Degraffenreid* so as to "tip the scales against the defendant."

We rule this point against appellant.

## VI

### The "Deal"

Next, appellant argues that the court erred in refusing to grant a mistrial during the prosecutor's argument because the state did not disclose "upon request" [8] the existence of a "deal" made with Wells in exchange for his testimony against Collett. Appellant also contends it was error for the prosecutor to comment on this in his argument. He relies on *State v. Brooks,* 513 S.W.2d 168 (Mo.App.1973), and the decisions of the Supreme Court of the United States.[9]

While appellant's point on appeal in this regard is that the court erred in failing to grant a mistrial because the state did not disclose the existence of a "deal" made with Wells in exchange for his testimony against Collett, the true issue as we see it is: Was there error because the jury was, as in *Brooks,* unaware of the facts which might cause Wells to be less than fully truthful or untruthful?

As stated in *Giglio v. United States,* supra, 405 U.S. at 153–154, 92 S.Ct. at 766, there is no question that ". . . deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice.' . . . In *Napue v. Illinois* [supra], we said, '[t]he same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected

---

**8.** In appellant's brief, he indicates that "[w]hen defense counsel, prior to trial, made his request for disclosure of evidence favorable to defendant, the prosecuting attorney should have been put on notice at the time to make inquiry." This is not the same point urged at trial and in the motion for new trial. See *State v. Stevens,* 467 S.W.2d

10, 18 (Mo.1971), cert. den., 404 U.S. 994, 92 S.Ct. 531, 30 L.Ed.2d 546 (1971).

**9.** *Napue v. People of the State of Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); *Brady v. State of Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).

when it appears.' . . . ." See also *State v. Ball,* 408 S.W.2d 17, 20 (Mo.1966); *State v. Thompson,* 396 S.W.2d 697, 700 (Mo. banc 1965); and *State v. Hurd,* 520 S.W.2d 158, 164–165 (Mo.App.1975).

The appellant relies on the well-settled principle first established in *Mooney v. Holohan,* 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1934), and developed in *Brady v. State of Maryland,* supra, that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good or bad faith of the prosecution." *Brady,* supra, 373 U.S. at 87, 83 S.Ct. at 1196. See also *State v. Thompson,* supra; *State v. Hurd,* supra, and Annot., 34 A.L.R.3d 17 (1970). This general principle was extended in *Napue v. People of the State of Illinois,* supra, to include false testimony which goes only to the credibility of a material prosecution witness. "The principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty, does not cease to apply merely because the false testimony goes only to the credibility of the witness. The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend. . . ." *Napue v. People of the State of Illinois,* supra, 360 U.S. at 269, 79 S.Ct. at 1177.

In *Giglio v. United States,* supra, where the only witness against the defendant denied that he had received any promises or entered into an agreement for prosecutorial leniency when in fact an affidavit of a prosecutor showed otherwise, the Supreme Court of the United States held that the credibility of the Government's witness was an important issue in the case and that "evidence of any understanding or agreement as to a future prosecution would be relevant to his [witness'] credibility and the jury was entitled to know of it." 405 U.S. at 155, 92 S.Ct. at 766.

Missouri courts have followed these decisions. We held in *State v. Brooks,* supra, that "[c]ourts have traditionally been cautious of convictions obtained upon the uncorroborated testimony of persons who have participated in the crime. . . . [F]or a jury to assess the credibility of a witness, it must be aware of facts which might cause a witness to be less than fully truthful or untruthful. The determination of that credibility is solely within the province of the jury and it is entitled to any information which might bear on that credibility." *State v. Brooks,* supra, 513 S.W.2d at 173. See also *State v. McClain,* 498 S.W.2d 798 (Mo. banc 1973).

█ These authorities recognize that when the reliability of a material witness may well be determinative of the guilt or innocence of the accused, nondisclosure of evidence affecting his credibility falls within the rule that suppression or nondisclosure of material evidence justifies a new trial.

█ In these decisions, the tests of whether or not a reversal of a conviction should result are (1) whether the nondisclosed evidence had a reasonable likelihood of affecting the judgment of the jury, *Giglio v. United States,* supra, 405 U.S. at 154, 92 S.Ct. 763; *Napue,* supra, 360 U.S. at 271, 79 S.Ct. 1173; *State v. McClain,* supra, 498 S.W.2d at 800; and (2) whether the evidence is "material." *Brady v. State of Maryland,* supra, 373 U.S. at 87, 83 S.Ct. 1194.

The whole thrust of *Napue, Giglio, Brooks* and other authorities is that the triers of facts are entitled to know and be aware of any arrangement or agreement with a material prosecution witness because such agreement might cause the witness to be less than truthful or untruthful, and

because without such information the triers of fact are unable to test the credibility of the material prosecution witness. In these decisions, the failure of the state to inform the triers of facts of an agreement or arrangement made *in fact* and disclosed by the record may well be determinative of the guilt or innocence of the accused.

In all of the authorities the jury was not aware or apprised of an arrangement or agreement made in fact between the material witness and the prosecution. Thus, the jury did not have the benefit of testing the credibility of the material prosecution witness.

■ We believe that under the circumstances here, the appellant's contention that he is entitled to a new trial because of a violation of the above authorities and because the state failed to disclose a "deal" is without merit.

First, the record, unlike all of the authorities discussed above, does not clearly disclose that any arrangement or agreement was made with Wells in exchange for his testimony against the appellant. "To warrant the granting of the motion for new trial, it is incumbent upon the defendant to show that the testimony used at trial was deliberately false and known to be so by the prosecution and that the conviction was obtained by reason thereof." *State v. Flauaus,* 515 S.W.2d 873, 880 (Mo.App.1974).

Furthermore, in all of the authorities the facts as to an agreement or arrangement were fully developed either in hearings, in other proceedings or by way of stipulation.

Secondly and much more important, the decisions relied upon and discussed above are not controlling or dispositive of this cause. The important and overriding consideration, under the above authorities, is that the jury must be aware of facts concerning an arrangement or agreement which might cause the witness to be less than truthful so that it is in a position to test the credibility of the material prosecution witness. In this case, the jury could not help but be aware of the facts which might cause Wells to be less than truthful. There are numerous instances in the record to show that it was clear to the jury that Wells participated in the robbery on March 3, that he pleaded guilty for his participation in that robbery and was placed on probation. These matters were brought out on numerous occasions by both the defense and prosecution. In view of such circumstances, the jury was not kept in the dark; they were aware of facts which might cause Wells to be less than truthful and were able to test his credibility. Hence, we believe that *Napue, Giglio* and *Brooks* are not controlling and dispositive of this case.

Furthermore, Wells was not, as in *Giglio,* supra, the only witness; there was strong, reliable evidence from Reverend Glenn, so that, unlike *Giglio,* the reliability of Wells may well not have been determinative, of guilt or innocence.

Under all the circumstances, we do not believe that a reversal is required here, for we do not believe that the authorities relied upon are dispositive of the issues here, and we do not believe that, under the tests of *Giglio, Napue* and *Brooks,* the nondisclosure of an agreement or arrangement, if any, affected, in any reasonable likelihood, the judgment of the jury or the outcome of the trial. Cf. *Pugh v. State,* 528 P.2d 719 (Okl. Cr.App.1974).

We find no abuse of due process. *State v. Flauaus,* supra, 515 S.W.2d at 879.

The argument of the prosecutor complained of was not error. It was retaliatory to defense counsel's argument. It was defense counsel who first used the term "deal." The prosecutor's argument did not clearly indicate that a "deal" had been made, but even if it had, the jury was aware of the information bearing upon the credibility of Wells.

We cannot conclude that the court erred in refusing to grant a mistrial and rule this point against appellant.

## VII

### Double Jeopardy

Lastly, appellant contends that the court erred in submitting instructions which authorized the jury to find the defendant guilty of both robbery and assault. He contends that such submissions subjected him to multiple convictions for a single offense and thus placed him twice in jeopardy. He argues that it "is clearly established from the testimony in this trial that the taking of money from Mr. Glenn was part and parcel of the assault upon his person . . . ." Hence, he contends that he could not be convicted of both robbery and assault.

It is true that a state cannot split a single crime and prosecute it in parts. As stated in *State v. Richardson*, 460 S.W.2d 537, 539 (Mo. banc 1970), quoting from In re Nielson, 131 U.S. 176, 9 S.Ct. 672, 33 L.Ed. 118, " 'Where * * * a person has been tried and convicted for a crime which has various incidents included in it, he cannot be a second time tried for one of those incidents without being twice put in jeopardy for the same offense.' " In *Richardson*, our Supreme Court held that where the necessary act toward commission of attempted robbery was the identical assault upon which the charge of assault with intent to maim was based and the defendant had been convicted of robbery, a subsequent prosecution for assault was violative of the rule against double jeopardy.

In *State v. Neal*, 514 S.W.2d 544 (Mo. banc 1974), our Supreme Court held that where a robbery was the result of an assault committed upon an employee of a hardware store, it was error to submit the assault charge. "To thus split the single crime of robbery and prosecute it in Count I and a second time in Count III as an assault violated the rule against double jeopardy." *State v. Neal*, supra, 514 S.W.2d 548. But

such is not the situation here, and this case is not governed by these principles in *Richardson* and *Neal*. *Richardson* also recognizes that:

> " 'If there is but a single act of force proved as an essential element of the crime of robbery, then such act of force cannot be availed of as constituting the separate crime of assault, *but the rule is otherwise where the existence of the distinct elements as realities is established, as where the force relied on to establish assault occurred after the robbery had been accomplished.*' " 460 S.W.2d at 540 (emphasis added).

Various cases and examples are given, including *Ex parte Chapman*, 43 Cal.2d 385, 273 P.2d 817 (Cal. bank 1954)—where the accused made an assault as part of robbery and subsequently committed a second assault on victim.

We believe that the latter principle applies here. In this case there were two distinct offenses. In this case the robbery was complete when the gun was "pulled" on Glenn, when he was ordered to open the cash register and the money was removed. This was sufficient to establish the elements of robbery under § 560.120.[10] *State v. Lawson*, 501 S.W.2d 176 (Mo.App.1973). Thereafter, Glenn was taken out the side door of the office, through the bay area and to the back room, where he was forced to lie on the ground and was then beaten about the head three times. This constituted a separate assault, and was a separate offense.

The court did not err, therefore, in submitting Instructions No. 8 and 11 dealing with assault.

## VIII

### Conclusion

We have read the lengthy transcript, the briefs submitted by the parties and all of

---

10. The felonious taking of property from another from his person or in his presence and against his will by violence to his person or by putting him in fear of some immediate injury to his person.

the authorities relied upon by the appellant. We are convinced that no prejudicial error occurred and thus conclude that the judgment of conviction should be affirmed.

The judgment is affirmed.

McMILLIAN and GUNN, JJ., concur.