## NAPUE *v.* ILLINOIS.

No. 583.   Argued April 30, 1959.—Decided June 15, 1959.

*George N. Leighton* argued the cause and filed a brief for petitioner.

*William C. Wines,* Assistant Attorney General of Illinois, argued the cause for respondent. With him on the brief were *Latham Castle,* Attorney General of Illinois, *Raymond S. Sarnow* and *A. Zola Graves,* Assistant Attorneys General.

MR. CHIEF JUSTICE WARREN delivered the opinion of the Court.

At the murder trial of petitioner the principal state witness, then serving a 199–year sentence for the same murder, testified in response to a question by the Assistant State's Attorney that he had received no promise of consideration in return for his testimony. The Assistant State's Attorney had in fact promised him consideration, but did nothing to correct the witness' false testimony. The jury was apprised, however, that a public defender had promised "to do what he could" for the witness. The question presented is whether on these facts the failure of the prosecutor to correct the testimony of the witness which he knew to be false denied petitioner due process of law in violation of the Fourteenth Amendment to the Constitution of the United States.

The record in this Court contains testimony from which the following facts could have been found. The murder in question occurred early in the morning of August 21, 1938, in a Chicago, Illinois, cocktail lounge. Petitioner Henry Napue, the witness George Hamer, one Poe and one Townsend entered the dimly lighted lounge and announced their intention to rob those present. An off-duty policeman, present in the lounge, drew his service revolver and began firing at the four men. In the melee that followed Townsend was killed, the officer was fatally wounded, and the witness Hamer was seriously wounded. Napue and Poe carried Hamer to the car where a fifth man, one Webb, was waiting. In due course Hamer was apprehended, tried for the murder of the policeman, convicted on his plea of guilty and sentenced to 199 years. Subsequently, Poe was apprehended, tried, convicted, sentenced to death and executed. Hamer was not used as a witness.

Thereafter, petitioner Napue was apprehended. He was put on trial with Hamer being the principal witness

for the State. Hamer's testimony was extremely important because the passage of time and the dim light in the cocktail lounge made eyewitness identification very difficult and uncertain, and because some pertinent witnesses had left the state. On the basis of the evidence presented, which consisted largely of Hamer's testimony, the jury returned a guilty verdict and petitioner was sentenced to 199 years.

Finally, the driver of the car, Webb, was apprehended. Hamer also testified against him. He was convicted of murder and sentenced to 199 years.

Following the conviction of Webb, the lawyer who, as former Assistant State's Attorney, had prosecuted the Hamer, Poe and Napue cases filed a petition in the nature of a writ of error *coram nobis* on behalf of Hamer. In the petition he alleged that as prosecuting attorney he had promised Hamer that if he would testify against Napue, "a recommendation for a reduction of his [Hamer's] sentence would be made and, if possible, effectuated." [1] The

---

[1] In relevant part, his petition read as follows:

"After Hamer was sentenced your petitioner [the Assistant State's Attorney] well knowing that identification of Poe, Napue and Webb if and when apprehended would be of an unsatisfactory character and not the kind of evidence upon which a jury could be asked to inflict a proper, severe penalty, and being unable to determine in advance whether Poe, Napue and Webb would make confessions of their participation in the crime, represented to Hamer that if he would be willing to cooperate with law enforcing officials upon the trial of [*sic*] trials of Poe, Napue and Webb when they were apprehended, that a recommendation for a reduction of his sentence would be made and, if possible, effectuated.

"Before testifying on behalf of the State and against Napue, Hamer expressed to your petitioner a reluctance to cooperate any further unless he were given definite assurance that a recommendation for reduction of his sentence would be made. Your petitioner, feeling that the interests of justice required Hamer's testimony, again assured Hamer that every possible effort would be made to conform to the promise previously made to him."

attorney prayed that the court would effect "consummation of the compact entered into between the duly authorized representatives of the State of Illinois and George Hamer."

This *coram nobis* proceeding came to the attention of Napue, who thereafter filed a post-conviction petition, in which he alleged that Hamer had falsely testified that he had been promised no consideration for his testimony,[2] and that the Assistant State's Attorney handling the case had known this to be false. A hearing was ultimately held at which the former Assistant State's Attorney testified that he had only promised to help Hamer if Hamer's story "about being a reluctant participant" in the robbery was borne out, and not merely if Hamer would testify at petitioner's trial. He testified that in his *coram nobis* petition on Hamer's behalf he "probably used some language that [he] should not have used" in his "zeal to do something for Hamer" to whom he "felt a moral obligation." The lower court denied petitioner relief on the basis of the attorney's testimony.

On appeal, the Illinois Supreme Court affirmed on different grounds over two dissents. 13 Ill. 2d 566, 150 N. E. 2d 613. It found, contrary to the trial court, that the attorney had promised Hamer consideration if he would testify at petitioner's trial, a finding which the State does not contest here. It further found that the Assistant State's Attorney knew that Hamer had lied in denying that

---

[2] The alleged false testimony of Hamer first occurred on his cross-examination:

"Q. Did anybody give you a reward or promise you a reward for testifying?

"A. There ain't nobody promised me anything."

On redirect examination the Assistant State's Attorney again elicited the same false answer.

"Q. [by the Assistant State's Attorney] Have I promised you that I would recommend any reduction of sentence to anybody?

"A. You did not."

he had been promised consideration. It held, however, that petitioner was entitled to no relief since the jury had already been apprised that someone whom Hamer had tentatively identified as being a public defender "was going to do what he could" in aid of Hamer, and "was trying to get something did" for him.[3] We granted cer-

---

[3] The following is Hamer's testimony on the subject:

"Q. [on cross-examination] And didn't you tell him [one of Napue's attorneys] that you wouldn't testify in this case unless you got some consideration for it?

"A. . . . Yes, I did; I told him that.

.              .              .              .              .

"Q. What are you sentenced for?

"A. One Hundred and Ninety-Nine Years.

"Q. You hope to have that reduced, don't you?

"A. Well, if anybody would help me or do anything for me, why certainly I would.

"Q. Weren't you expecting that when you came here today?

"A. There haven't no one told me anything, no more than the lawyer. The lawyer come in and talked to me a while ago and said he was going to do what he could.

"Q. Which lawyer was that?

"A. I don't know; it was a Public Defender. I don't see him in here.

"Q. You mean he was from the Public Defender's office?

"A. I imagine that is where he was from, I don't know.

"Q. And he was the one who told you that?

"A. Yes, he told me he was trying to get something did for me.

"Q. . . . And he told you he was going to do something for you?

"A. He said he was going to try to.

.         .         .         .            .         .

"Q. And you told them [police officers] you would [testify at the trial of Napue] but you expected some consideration for it?

"A. I asked them was there any chance of me getting any. The man told me he didn't know, that he couldn't promise me anything.

"Q. Then you spoke to a lawyer today who said he would try to get your time cut?

"A. That was this Public Defender. I don't even know his name. . . ."

tiorari to consider the question posed in the first paragraph of this opinion. 358 U. S. 919.

*First,* it is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment, *Mooney* v. *Holohan,* 294 U. S. 103; *Pyle* v. *Kansas,* 317 U. S. 213; *Curran* v. *Delaware,* 259 F. 2d 707. See *New York ex rel. Whitman* v. *Wilson,* 318 U. S. 688, and *White* v. *Ragen,* 324 U. S. 760. Compare *Jones* v. *Commonwealth,* 97 F. 2d 335, 338, with *In re Sawyer's Petition,* 229 F. 2d 805, 809. Cf. *Mesarosh* v. *United States,* 352 U. S. 1. The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears. *Alcorta* v. *Texas,* 355 U. S. 28; *United States ex rel. Thompson* v. *Dye,* 221 F. 2d 763; *United States ex rel. Almeida* v. *Baldi,* 195 F. 2d 815; *United States ex rel. Montgomery* v. *Ragen,* 86 F. Supp. 382. See generally annotation, 2 L. Ed. 2d 1575.

The principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty, does not cease to apply merely because the false testimony goes only to the credibility of the witness. The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence; and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend. As stated by the New York Court of Appeals in a case very similar to this one, *People* v. *Savvides,* 1 N. Y. 2d 554, 557; 136 N. E. 2d 853, 854–855; 154 N. Y. S. 2d 885, 887:

> "It is of no consequence that the falsehood bore upon the witness' credibility rather than directly upon defendant's guilt. A lie is a lie, no matter

what its subject, and, if it is in any way relevant to the case, the district attorney has the responsibility and duty to correct what he knows to be false and elicit the truth. . . . That the district attorney's silence was not the result of guile or a desire to prejudice matters little, for its impact was the same, preventing, as it did, a trial that could in any real sense be termed fair."

*Second,* we do not believe that the fact that the jury was apprised of other grounds for believing that the witness Hamer may have had an interest in testifying against petitioner turned what was otherwise a tainted trial into a fair one. As Mr. Justice Schaefer, joined by Chief Justice Davis, rightly put it in his dissenting opinion below, 13 Ill. 2d 566, 571, 150 N. E. 2d 613, 616:

"What is overlooked here is that Hamer clearly testified that no one had offered to help him except an unidentified lawyer from the public defender's office."

Had the jury been apprised of the true facts, however, it might well have concluded that Hamer had fabricated testimony in order to curry the favor of the very representative of the State who was prosecuting the case in which Hamer was testifying, for Hamer might have believed that such a representative was in a position to implement (as he ultimately attempted to do) any promise of consideration. That the Assistant State's Attorney himself thought it important to establish before the jury that no official source had promised Hamer consideration is made clear by his redirect examination, which was the last testimony of Hamer's heard by the jury:

"Q. Mr. Hamer, has Judge Prystalski [the trial judge] promised you any reduction of sentence?

"A. No, sir.

"Q. Have I promised you that I would recommend any reduction of sentence to anybody?

"A. You did not. [That answer was false and known to be so by the prosecutor.]

"Q. Has any Judge of the criminal court promised that they [sic] would reduce your sentence?

"A. No, sir.

"Q. Has any representative of the Parole Board been to see you and promised you a reduction of sentence?

"A. No, sir.

"Q. Has any representative of the Governor of the State of Illinois promised you a reduction of sentence?

"A. No, sir."

We are therefore unable to agree with the Illinois Supreme Court that "there was no constitutional infirmity by virtue of the false statement."

*Third,* the State argues that we are not free to reach a factual conclusion different from that reached by the Illinois Supreme Court, and that we are bound by its determination that the false testimony could not in any reasonable likelihood have affected the judgment of the jury. The State relies on *Hysler* v. *Florida,* 315 U. S. 411. But in that case the Court held only that a state standard of specificity and substantiality in making allegations of federal constitutional deprivations would be respected, and this Court made its own "independent examination" of the allegations there to determine if they had in fact met the Florida standard. The duty of this Court to make its own independent examination of the record when federal constitutional deprivations are alleged is clear, resting, as it does, on our solemn responsibility for maintaining the Constitution inviolate. *Martin* v. *Hunter's Lessee,* 1 Wheat. 304; *Cooper* v. *Aaron,* 358 U. S. 1.

This principle was well stated in *Niemotko* v. *Maryland,* 340 U. S. 268, 271:

> "In cases in which there is a claim of denial of rights under the Federal Constitution, this Court is not bound by the conclusions of lower courts, but will reexamine the evidentiary basis on which those conclusions are founded."

It is now so well settled that the Court was able to speak in *Kern-Limerick, Inc.,* v. *Scurlock,* 347 U. S. 110, 121, of the "long course of judicial construction which establishes as a principle that the duty rests on this Court to decide for itself facts or constructions upon which federal constitutional issues rest." [4]   As previously indicated, our own evaluation of the record here compels us to hold that the false testimony used by the State in securing the conviction of petitioner may have had an effect on the outcome of the trial.   Accordingly, the judgment below must be

*Reversed.*

---

[4] See, *e. g., Payne* v. *Arkansas,* 356 U. S. 560, 562; *Leyra* v. *Denno,* 347 U. S. 556, 558; *Avery* v. *Georgia,* 345 U. S. 559, 561; *Feiner* v. *New York,* 340 U. S. 315, 322, 323, note 4 (dissenting opinion); *Cassell* v. *Texas,* 339 U. S. 282, 283; *Haley* v. *Ohio,* 332 U. S. 596, 599; *Malinski* v. *New York,* 324 U. S. 401, 404; *Ashcraft* v. *Tennessee,* 322 U. S. 143, 149; *Ward* v. *Texas,* 316 U. S. 547, 550; *Smith* v. *Texas,* 311 U. S. 128, 130; *South Carolina* v. *Bailey,* 289 U. S. 412, 420.  See also, *e. g., Roth* v. *United States,* 354 U. S. 476, 497 (dissenting opinion); *Stroble* v. *California,* 343 U. S. 181, 190; *Sterling* v. *Constantin,* 287 U. S. 378, 398; *Southern Pacific Co.* v. *Schuyler,* 227 U. S. 601, 611; *Creswill* v. *Grand Lodge Knights of Pythias,* 225 U. S. 246, 261.

Mr. Justice Holmes, writing for the Court, recognized the principle over 35 years ago in *Davis* v. *Wechsler,* 263 U. S. 22, 24:

"If the Constitution and laws of the United States are to be enforced, this Court cannot accept as final the decision of a state tribunal as to what are the facts alleged to give rise to the right or to bar the assertion of it even upon local grounds."