234 So.2d 297 (1970)
Lynda MILLER
v.
STATE of Mississippi.
No. 45773.
Supreme Court of Mississippi.
April 13, 1970.
Rehearing Denied May 11, 1970.
*298 Albert S. Johnston, III, Pascagoula, for appellant.
A.F. Summer, Atty. Gen., by Guy N. Rogers, Asst. Atty. Gen., and Wade H. Creekmore, Jr., and James H. Creekmore, Special Asst. Attys. Gen., Jackson, for appellee.
PATTERSON, Justice:
This is an appeal from a judgment of the Circuit Court of Jackson County wherein Lynda Miller was found guilty of attempted kidnapping and sentenced to serve ten years in the state penitentiary. She assigns and argues the following for reversal.
1. The trial court erred in overruling the appellant's motion for a directed verdict on the defense of entrapment.
2. Appellant was denied due process of law in that her Fifth and Fourteenth Amendment rights under the United States Constitution were violated when the State failed to correct its chief witness's false testimony, such testimony being essential to the conviction of the appellant.
3. The trial court erred when it refused appellant's motion for a new trial on newly discovered evidence.
The State's witnesses were James Files, an agent of the Federal Bureau of Investigation, Charles Barber, the Chief of Police of Moss Point, Houston "Sonny" Evans, an accomplice, Ben D. Navarette, the Sheriff of Jackson County, John J. Whitehead, Jr., the husband of the intended kidnap victim, and Matt Cox, Chief Deputy of the county.
The testimony of James Files was that he received a telephone call about six o'clock on the evening of March 16, 1969, advising him a kidnapping was to take place in Pascagoula the following day. He did not know the intended victim, but was given the name of Leo Miller as the person who was to carry out the plot. This name was passed on to the Chief of Police of Moss Point.
Chief Barber testified that he received a call on the night of March 16 from Files regarding a planned kidnapping. He was given the names of Leo Miller and Sonny Evans as the kidnapping conspirators. The following morning he obtained a warrant for Miller's arrest on a bad check charge. He testified that upon arriving at Miller's home he was advised by Miller's wife, the appellant here, that Miller was away in New York, but after conducting a search of the residence, he found Miller hiding under the insulation in the attic, whereupon he arrested and incarcerated him in the city jail. Chief Barber stated that several times during the course of the day the appellant *299 talked with her husband in the jail. Meanwhile he was advised by Evans that the defendant intended to go through with the kidnap plot even though her husband was incarcerated. Chief Barber also testified that he learned that Mrs. John Whitehead, Jr., was the intended kidnap victim and was later in a conference with the district attorney and others in which Evans was requested by the officials to go along with the plot.
The next morning, prior to the time the kidnapping was to occur, Barber concealed himself in the woods near the home of Whitehead. Shortly thereafter, an automobile driven by Sonny Evans, who was accompanied by the appellant, came into the driveway and stopped in the carport, whereupon the defendant and Evans got out of the car and knocked on the door of the residence. It was immediately opened by Sheriff Navarette and the appellant and Evans were arrested.
Houston "Sonny" Evans testified the appellant was present and participated in the planning of the kidnapping prior to Miller's arrest, the details of which were that the witness and Miller were to go to the Whitehead home the next morning after Mr. Whitehead and his children had departed for work and school. Upon entering the home they would seize her, tape her hands and mouth and then place her in one of the Whitehead automobiles and transport her to a designated area where she would be shot. Miller would then call the victim's husband and direct him to bring the ransom money to them at the Alabama-Mississippi state line. When this was done, Miller and the witness would then fly from Mobile, Alabama to Chicago or New York with the money where it would be exchanged for other money in case the serial numbers of that obtained had been recorded. Thereafter, the proceeds would be sent to the appellant so that she might pay Miller's debts.
That night, however, according to Evans, he contacted the Federal authorities and told them of the plan, thereby disrupting it. Later, however, when the appellant and Evans visited Miller in the Moss Point jail, the appellant told him that she intended to go through with the plan since that was the only way she could secure her husband's release. He thereupon informed Chief Barber that the appellant intended to follow through with the plot.
Subsequently, Evans attended a meeting of law enforcement officials in the office of the district attorney. After conferring, it was determined that the Whitehead family should be moved from their home and that the sheriff and other law officers would wait at the house or nearby for the appellant and the witness to carry out their plan.
The following morning, according to Evans, he called for the appellant at her house and they proceeded toward the Whitehead residence. As they approached she suggested that they go by the office of the victim's husband to see if his car was there. However, after proceeding some two or three blocks, it was decided that since the car of Mr. Whitehead was not at the house they might as well return and complete their mission. They then drove to the Whitehead residence, got out of the automobile, and both Evans and the appellant knocked on the door at which time it was opened by the sheriff and they were arrested.
On cross-examination the witness was interrogated with regard to his release under bond which is significant on both the question of reversal as well as on motion for a new trial.
"Q. All right, you were charged. Did you stay in jail?
"A. I was in jail one night and got out.
"Q. Were you under bond?
"A. Yes, sir.
"Q. How much?
"A. $5,000.00.

*300 "Q. Who signed your bond?
"A. Mr. Thornton.
"Q. Mr. Thornton. Do you know where that bond is now?
"A. No, sir, I don't.
"BY MR. CUMBEST: We object to that.
"BY THE COURT: Sustained."
On redirect examination by the district attorney the witness Evans was asked:
"Q. Mr. Johnston asked you about the charge that was filed against you, do you remember that? You remember when Mr. Johnston asked you awhile ago whether or not charges had been filed against you?
"A. Yes, sir.
"Q. And you said they had. I filed those charges against you for conspiracy to kidnap, did I not?
"A. Yes, sir.
"Q. And I advised you of that and you came down and made bond, do you remember that?
"A. Yes, sir."
Sheriff Navarette, the next witness, testified that he first became aware of the plan on the evening of March 17 and that he was in conference with the district attorney and others concerning the matter. The following day he and Chief Deputy Cox secreted themselves in the Whitehead home. Thereafter, at about 8:30 a.m., the vehicle driven by Evans, who was accompanied by the appellant, approached the Whitehead home, decreased its speed, and drove on, but later returned and came into the carport, whereupon Evans and the defendant alighted, came to the door and knocked. He opened it and immediately arrested and searched the defendant and took from her purse a loaded and cocked .32 caliber pistol.
On cross-examination he testified that Evans was requested to go through with the kidnap plan, but that Evans was promised no immunity.
Whitehead testified that he was advised by the authorities that he and his wife were the intended victims of a kidnap plot. He thereafter conferred with the law enforcement officers with regard thereto, and the following morning he removed his wife and children from the home, leaving the officers to apprehend the conspirators.
Chief Deputy Cox's testimony was virtually that of the sheriff except it was his testimony that the knock at the door was that of the defendant rather than Evans. He then explained, upon questioning, that they both knocked on the door.
Leo Miller, defendant's husband, testified that only he and Evans made plans for the kidnapping and that his wife was totally unaware of it. He additionally testified that while he was in jail, he advised his wife not to do anything that Evans might ask of her. He admitted on cross-examination that he had pled guilty to a charge of conspiracy to kidnap during the term of court.
The defendant gave evidence in her own behalf. She denied any knowledge of the plan. She admitted visiting her husband while he was in jail, but denied telling Evans that she intended to go through with the plan. She testified that Evans called her the following morning and requested her to don a wig and accompany him on a drive, but that she did not know its purpose. She further stated that she complied with Evans' request and explained that she wore the wig since she did not feel it becoming for her to be riding in an automobile with Evans while her husband was confined in jail and that she did not desire to be recognized. She also testified that she did not obtain the pistol, explaining that Evans obtained it from a drawer in her home after requesting its whereabouts and that later he put this weapon in her opened purse as they approached the Whitehead home.
She maintained by her testimony that she was in fact kidnapped by Evans and forced *301 through fear to assist him in the kidnapping of Mrs. Whitehead, her aid to consist of holding the pistol upon the victim while Evans bound and gagged her. She denied that she knocked upon the door of the Whitehead home.
As mentioned, the jury found the defendant guilty and she was sentenced to ten years in the state penitentiary.
Thereafter, the appellant filed a motion for a new trial based on newly discovered evidence. This evidence consisted of the testimony of Mr. Thornton who testified that he did not make a $5,000 bond for the witness Evans on the 18th or 19th of March as testified to by this witness. In fact, he made no bond for Evans. At this juncture the district attorney stated, "Your Honor, to save time, we will stipulate that the other two bondsmen did not sign a bond."
The first point on appeal is that the appellant was entrapped by the officers into participating in the kidnap plot. It is argued that she committed no overt act toward the commission of the crime, her participation therein being at most passive and subservient to the actions of Evans who, it is insisted, committed each and every act necessary for the commission of the crime. In support of this position the appellant cites Strait v. State, 77 Miss. 693, 27 So. 617 (1900). An examination of this case reveals it to be distinguishable from the present by its facts in that the defendant, an office boy with keys to enter the building, was induced by a detective to enter an office on the pretense that the detective had left a bundle therein. Upon opening the door and entering with the detective he was immediately arrested, the distinguishing fact being that the entrapment was the product of the detective's mind and not that of the boy, while here the crime was the product of Miller, Evans, and the defendant rather than the law enforcement officers.
In Averitt v. State, 246 Miss. 49, 149 So.2d 320 (1963) the cases on the subject of entrapment in our jurisdiction are analyzed and the rule of law is reannounced that if the criminal intent originates with the accused and the officers furnish the opportunity and means for the accused to consummate the purpose of the criminal intent that such does not constitute entrapment. See also Hogan v. State, Miss., 233 So.2d 786, decided April 6, 1970, wherein we adopted that position stated in McLemore v. State, 241 Miss. 664, 675, 125 So.2d 86, 91, 126 So.2d 236 (1960) as follows:
The word "entrapment", as a defense, has come to mean the act of inducing or leading a person to commit a crime not originally contemplated by him, for the purpose of trapping him in its commission and prosecuting him for the offense. However, defendant cannot rely on the fact that an opportunity was intentionally given him to commit the crime which originated in the mind of the accused. The fact that an opportunity is furnished constitutes no defense. 1 Anderson's Wharton's Criminal Law and Procedure (1957), Sec. 132. There is a very clear distinction between inducing a person to do an unlawful act, and setting a trap to catch him in the execution of criminal designs of his own conception.
In applying this rule to the facts of the present case we conclude that the defendant was not induced to commit a crime not originally contemplated by her for the purpose of entrapment. We are therefore of the opinion that this assignment is without merit.
The next point raised for reversal is that the appellant's Fifth and Fourteenth Amendment rights under the United States Constitution were violated by the use of false testimony to procure the conviction of the defendant, citing Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959) wherein it was established that a conviction obtained through the use of false testimony, known to be such by representatives *302 of the State, must fall under the Fourteenth Amendment and the same result obtained when the State, although not soliciting false evidence, allows it to go uncorrected when it appears. The principle was also established that a state may not knowingly use false evidence, including false testimony, to obtain a tainted conviction and that in any concept of ordered liberty this principle does not cease to apply merely because the false testimony goes only to the credibility of the witness. The appellant contends that the testimony of Houston Evans elicited on cross-examination relating to the bond quoted above was false and that the district attorney knew it to be false, and therefore the Napue case is applicable and requires this Court to reverse. In Napue the witness giving false testimony had been sentenced to serve 199 years in prison and had been given consideration by the State's attorney. The same attorney asked the witness during the trial: "Q. Have I promised you that I would recommend any reduction of sentence to anybody?" "A. You did not. [That answer was false and known to be so by the prosecutor.]" 360 U.S. at 271, 79 S.Ct. at 1178, 3 L.Ed.2d at 1222. It is thus apparent in Napue that there was a deliberate use of testimony known to be false to aid in a conviction.
In the present case the district attorney did not initiate the interrogation concerning the bond, but rather it was brought out by the defense attorney on cross-examination. "* * * You remember when Mr. Johnston asked you awhile ago whether or not charges had been filed against you?" "A. Yes, sir." "Q. And you said they had. I filed those charges against you for conspiracy to kidnap, did I not?" "A. Yes, sir." "Q. And I advised you of that and you came down and made bond, do you remember that?" "A. Yes, sir." The question propounded was unusual. The first portion of it, a statement, referred to the filing of kidnap charges against the witness. The second, also a statement, referred to the bond. The following interrogatory, "Do you remember that," drew the response "Yes, sir." The answer as now revealed by the record was partially true in that the witness was advised that charges were filed against him. It was partially false since it is now apparent from the evidence given on the motion for a new trial that the witness had not made bond. The issue thus presented is whether the leading and suggestive question propounded by the State's attorney wherein he suggested that the witness "came down and made bond" is the equivalent of using false testimony with knowledge of its falsity to aid in procuring a conviction and which was condemned in Napue. We are of the opinion that the issue must be answered in the negative since it was not initiated by the State's attorney and there is nothing to indicate knowledge on his part of its falsity nor is there any indication that its use was deliberately made to deceive the jury. We conclude that this assignment of error does not reach the grave proportions of Napue, supra, and that it does not require reversal here.
The third assignment of error is based upon the same argument and authorities cited above and for the same reasons we are of the opinion that it is not well taken.
We have given utmost consideration to the record, the briefs and arguments of counsel and have detailed much of the evidence in this opinion. Over all we are convinced that the defendant was afforded a fair trial and that there was sufficient competent evidence to warrant the verdict of the jury. The cause is therefore affirmed.
Affirmed.
ETHRIDGE, C.J., and INZER, SMITH, and ROBERTSON, JJ., concur.