407 A.2d 491.

STATE *vs.* JOHN CARILLO.

NOVEMBER 2, 1979.

PRESENT: Joslin, Kelleher, Doris and Weisberger, JJ.

KELLEHER, J. This two-count indictment charges the defendant, John Carillo (Carillo), with the crimes of murder and conspiracy to murder. Both counts arise from the June 22, 1973, stabbing death of Donald Price (Price), which occurred while Price, a state corrections officer, was on duty at the Adult Correctional Institutions (ACI). Carillo was found guilty on both counts after trial by a Superior Court jury and, on November 30, 1973, was sentenced to life imprison-

ment on the murder charge and 10 years' imprisonment on the conspiracy charge. Thereafter, he appealed to this court.

Subsequent to the docketing of Carillo's appeal, information was received that cast doubt upon the testimony of a prosecution witness, an agent of the Federal Bureau of Investigation (FBI) who had performed scientific tests for the state and had given testimony about the results of those tests at the trial. On the basis of that information, Carillo, claiming newly discovered evidence, filed a new-trial motion. We thereupon remanded the case to the Superior Court for a hearing on that motion. On October 26, 1977, the Superior Court denied Carillo's motion for a new trial and ordered the case returned to this court.

The record reveals that in June of 1973 Carillo was confined in what is known as the B dormitory of the medium-security building at the ACI. Shortly after midnight on June 22, 1973, Price was found lying on the floor near a desk from which he was keeping watch on the prisoners living in B dorm. Price was suffering from several stab wounds and was unable to respond to questions about the attack. He died shortly after being admitted to a nearby hospital.

Within minutes, the state police arrived at the scene and immediately initiated an investigation. Each inmate of B dorm was handcuffed and led away for questioning, and the premises were throughly searched for physical evidence. The search revealed, among other things, a type of table knife whose blade had been sharpened and whose handle had been wrapped with twine. The blade appeared to have "wiped-off blood" on it. Also seized were two pairs of discarded undershorts, at least one of which was spattered with what again appeared to be blood. In addition, the officers seized the sheets from Carillo's bed because they, too, were apparently stained with what one officer believed to be blood.

There is also evidence in the record that the officers, prior to making any arrests, received a statement from at least one inmate who had heard screams for help at approximately the time Price had been stabbed and who had seen Carillo and

another prisoner running from the scene of the murder immediately after Price's screams were heard. On the basis of both the physical evidence seized and the statements received from people in the area, the officers made arrests, including that of Carillo.

A visual examination of Carillo indicated the presence of what appeared to be blood on his right forearm. Consequently, Carillo was subjected to a further examination designed to reveal the presence of blood on his body. For that purpose, the chemical reagent benzidine was used. In the words of one expert, benzidine is one of the most commonly used tests for the detection of the presence of blood. Application of the benzidine to Carillo's body indicated the possible presence of blood.

Carillo objects strenuously to the admission of the evidence of the results of the benzidine test as well as to the use of photographs taken of him after he had been given the benzidine test. The most basic objection raised is an evidentiary one since Carillo claims that there was an inadequate foundation laid for admission of the test results. Specifically, he argues that the evidence was inadmissible because (1) no foundation was laid that the application of benzidine to the body of a living person was a generally accepted procedure in the field; (2) the state's experts had not themselves conducted research demonstrating the reliability and accuracy of such a use of the test; and (3) the police officer who administered the test was not shown to be qualified to do so.

The last objection is quite easily answered. During the extensive voir dire hearing conducted by the trial justice, the officer involved testified that he had conducted "over a hundred blood tests." Further, we agree with the statement of the United States Court of Appeals for the District of Columbia Circuit that, speaking with reference to application of benzidine to a human body, "[t]he simplicity of the test makes it unnecessary to have it conducted by a physician. It is a chemical test not a medical test and was properly administered by a trained police technician. *United States* v.

*Smith,* 470 F.2d 377, 379 (D.C. Cir. 1972). The officer's qualifications as such a technician cannot be seriously challenged. In any case, it is well settled that the question of a witness' qualification to testify as an expert is within the sound judicial discretion of the trial justice. *State v. Johnson,* 119 R.I. 749, 763, 383 A.2d 1012, 1020 (1978); *State v. Earley,* 118 R.I. 205, 210, 373 A.2d 162, 165 (1977).

The remaining evidentiary objections can be discussed together. The primary challenge to the test results rests on the fact that they were admittedly not conclusive. Each expert called before the court testified that normal procedure in all cases of a preliminarily positive result was to perform additional tests to confirm positively the presence of blood; the experts testified that only a negative result could be considered conclusive, that is, in reference to the *absence* of blood. Nonetheless, the results of the intial test can be considered quite weighty by experts because, as both the officer who administered the test and Dr. David R. Defanti, the director of the University of Rhode Island Crime Laboratory, testified, benzidine almost instantly turns a deep blue to blueish-green color when exposed to what is in fact blood. That reaction was precisely the one obtained when the test was performed on Carillo. Admittedly, what is called a "false positive" is obtained when benzidine is exposed to a rather large number of other substances that also contain the peroxidase enzyme present in blood; however, it was the understanding of these same witnesses that the chemical reaction in such a case would be noticeably slower and less intense in color. In addition, it was their opinion that exposure to any of those substances would nonetheless *not* produce a reaction if the skin had in the interim been washed with even soap and water; the effects of blood, on the other hand, are not so easily removed. It seems unlikely that Carillo was sufficiently exposed to any of those substances that would cause a "false positive,"[1] considering the limited nature of his mobility at

---

[1] Examples of those substances are horseradish, radish, oranges, lemons, grapefruit, leaves, grass, asparagus, carrots, garden peas, squash, bananas, cauliflower, romaine lettuce, potatoes, green beans, dandelion root, black fig pulp, green onion bulbs, and watermelon; in addition, exposure to certain industrial cleaning solutions might produce a "false" reaction.

the time. Further, Carillo himself testified to having showered only a few hours before the stabbing. In light of this evidence, and because the record tends to confirm that the test would operate with the same, though limited, degree of conclusiveness, we must agree with the conclusion of the trial justice that the results of the test were probative. Further, we agree with him that

> "[t]he possibility of misleading the jury, because of the controlled situation in which these events occurred up to and including the test is remote, since the jury will be aware that the test is preliminary only and not scientifically conclusive for the presence of blood. This possibility does not outweigh the probative value of the test results."

*See United States* v. *Sheard,* 473 F.2d 139, 148-49 (D.C. Cir. 1972), *citing Griffin* v. *United States,* 183 F.2d 990 (D.C. Cir. 1950).

Carillo also objects to the use of the test results because the test was performed without a search warrant and consequently runs afoul of the fourth and fourteenth amendments. Carillo's suppression motion came on to be heard during a lapse in the jury-selection process. The defense presented as its only witness a state police detective who was part of a team of detectives that, upon its arrival at B dormitory, had begun to interrogate all the inmates lodged in that facility. The detective testified that Christopher Perry told him that he, Perry, had seen Carillo sneak up on Price and stab the officer in the chest. The detective also related that, according to Perry, he had earlier in the day — at Carillo's instructions — picked up a rock in the prison yard and given it to Carillo, who in turn used the rock as knife sharpener. This witness also stated that the arrest had preceded the administration of the benzidine test. Immediately after the detective finished his testimony, the defense rested. Thereafter, the trial justice ruled that there were reasonable grounds for Carillo's arrest, and we affirm this finding.

On appeal, however, Carillo takes further aim at the denial of the motion to suppress by referring us to *Chimel* v. *United States*, 395 U.S. 752, 763, 89 S. Ct. 2034, 2040, 23 L. Ed. 2d 685, 694 (1969), a holding that recognizes a warrantless search as being an incident of a valid arrest but stresses that most often such a search is justified either to protect the safety of the arresting officer or to deprive the arrestee of a potential means of escape or an opportunity to destroy evidence of a crime. Carillo now claims that none of these exigencies were shown to be present when the benzidine swab was being applied to his body.

At this juncture, we are presently reviewing the correctness of the trial justice's denial of the motion to suppress. At no time while the motion was before the trial justice did Carillo's trial counsel make any effort in the way of evidentiary presentation to alert the trial justice to what Carillo's present appellate counsel now maintains was the actual fact when the police went about their task at the prison during the early morning hours of June 22, 1973. While Carillo now asks that we consider this issue in the light of *all* the relevant evidence in the record, we shall not do so having in mind the present posture of this case.

Redress in this particular area can be sought by way of our Postconviction Relief Act, G.L. 1956 (1969 Reenactment), ch. 9.1 of title 10. If Carillo chooses to follow this route, consideration should be given to the issue of whether or not the application of benzidine to the body constitutes a search.[2] Our examination of the benzidine cases indicates that there is an assumption by the reviewing courts that such a technique constitutes a search. We are not yet convinced that this is so. However, for the purposes of the balance of this opinion, we shall assume that it is.

---

[2]Another point of interest should be the rule enunciated in *Gustafson* v. *Florida*, 414 U.S. 260, 94 S. Ct. 488, 38 L. Ed. 2d 456 (1973), and *United States* v. *Robinson*, 414 U.S. 218, 94 S. Ct. 467, 38 L. Ed. 2d 427 (1973), which holds that a full search of an arrestee's person is reasonable in the case of a lawful custodial arrest.

The final challenge to admissibility of the results of the benzidine test raises a somewhat interesting question. Carillo claims that the "search" was in fact invalid under the fourth and fourteenth amendments because of the clear carcinogenic properties of benzidine, properties that, according to Carillo, offended fundamental standards of decency and fairness and thus operated to deprive him of his due-process rights. Assuming for purposes of this discussion that the health dangers warned of by Carillo are accurate, we must nonetheless judge the officer's actions in light of the knowledge possessed at the time; similarly, whatever may be our opinion of the "fairness" of such a test in light of present knowledge, we must measure the officer's actions against community standards of fair play and decency as they existed at the time. In this regard, our review reveals that the issue of the test's hazards was not raised at trial. Rather, this question is being raised for the first time on appeal.

Indeed, the only hints at trial of the possible danger in using the substance came from witnesses for the state. Specifically, the state's principal toxicologist testified that he would be "very reluctant" to perform the test on human skin because the chemical is an irritant; further, Thomas B. Curran (Curran), an agent of the FBI who testified for the state, testified that he would not have used benzidine on a body "[b]ecause it's carcinogenic." Yet, Carillo points to no other testimony concerning the test's danger, indicating that neither the defense nor the state had any detailed basis upon which to question the procedure's constitutionality on that ground. Consequently, we cannot now say that, in light of what was known at the time, the test was unreasonable or that it offended common notions of decency. Furthermore, since the police were apparently unaware of any serious danger either to Carillo or to the officer who performed the test, it seems clear that application of the exclusionary rule in this case could not possibly serve its stated purpose of deterring unconstitutional methods of law enforcement. *E.g., State* v. *Spratt,* 120 R.I. 192, 193-94, 386 A.2d 1094, 1095 (1978), *citing, inter alia, United States* v. *Janis,* 428 U.S. 433,

446-47, 96 S. Ct. 3021, 3028-29, 49 L. Ed. 2d 1046, 1056 (1976).

Turning to the denial of the newly discovered evidence motion, we repeat the principle that the trial court's determination of this issue is accorded great weight by this court. *E.g., Powers* v. *Carvalho,* 117 R.I. 519, 524, 368 A.2d 1242, 1246 (1977); *State* v. *Jefferson,* 116 R.I. 124, 129, 353 A.2d 190, 194 (1976). The record indicates that Agent Curran of the FBI was called by the state to testify to the results of the serological tests he had performed on items seized on the night of the murder. During the course of his testimony, Curran testified that benzidine turns blue "immediately" if blood is present, but that a false-positive reaction is delayed. Specifically his testimony was that "[i]t [the reaction time] might be as much as two or three minutes, or half an hour, or something to that effect"; further, he testified that the color of a false positive "is a light blue, much lighter blue." In this respect, it seems quite clear to us that Curran's testimony did no more than mirror the expert opinions given earlier in the trial and outlined above. However, after the trial, the state received and passed on to the defense information from Clarence Kelly, director of the FBI, concerning Curran, his qualifications, and the possible unreliability of his testimony. First, it was learned that Curran's trial testimony stating that he possessed a Master's Degree in zoology was false because, even though he had taken all the courses required for the Master's Degree, Curran had in fact failed to submit the required thesis. In addition, it was learned that Curran had resigned from the FBI during an inquiry into his conduct of another investigation; apparently, Curran had reported results of tests that he had never actually performed and had then lied under oath concerning those examinations.

We acknowledge the seriousness of knowing misrepresentation by a witness for the state. *See, e.g., United States* v. *Agurs,* 427 U.S. 97, 103, 96 S. Ct. 2392, 2397, 49 L. Ed. 2d 342, 349 (1976); *Napue* v. *Illinois,* 360 U.S. 264, 269-70, 79 S. Ct. 1173, 1177, 3 L. Ed. 2d 1217, 1221 (1959). We also accept for purposes of this discussion that the misrep-

resentation, if cause for objection, is no less so because the prosecuting attorney was unquestionably unaware of the falsehood. *See, e.g., Schneider* v. *Estelle,* 552 F.2d 593, 595 (5th Cir. 1977); *Barbee* v. *Warden,* 331 F.2d 842, 846 (4th Cir. 1964); *Smith* v. *Florida,* 410 F.2d 1349 (5th Cir. 1969). However, we must observe that the agent's misrepresentation solely concerned his possession of an advanced degree. As indicated above, Curran's testimony about the reaction of benzidine with various substances was strictly cumulative in nature; similarly, a post-trial reexamination by another FBI specialist of the articles originally examined by Curran corroborated the findings testified to by Curran.

Carillo argues that "[h]ad the jury been aware of Mr. Curran's falsehood regarding his qualifications, they would have been less likely to believe his testimony concerning the reaction time of Benzidine to false positives." Although such a statement cannot be made with certainty, we accept for present purposes that revelation of Curran's actual educational status might have lessened his credibility somewhat. Yet, in denying the new-trial motion, the trial justice specifically found that "Curran still is qualified by education and experience and training to be an expert in his field." Indeed, taking together the cumulative nature of much of Curran's testimony, the confirmatory tests run after trial by the FBI, the evidence otherwise before the jury (characterized by the trial court as "overwhelming"), and the precise nature of Curran's misrepresentation, we must conclude that there exists no reasonable likelihood that the testimony as to a Master's Degree could have affected the judgment of the jury. *United States* v. *Agurs,* 427 U.S. 97, 103, 96 S. Ct. 2392, 2397, 49 L. Ed. 2d 342, 349 (1976); *Napue* v. *Illinois,* 360 U.S. 264, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959); *State* v. *Carsetti,* 111 R.I. 642, 651, 306 A.2d 166, 171 (1973). That being the case, we cannot fault the denial of Carillo's motion for a new trial.

Carillo also alleges that the trial justice erred in permitting the state, over the objection of his counsel, to question Carillo in the presence of the jury concerning his having requested

the assistance of counsel once he learned he was under arrest. Such questioning, he claims, was designed to plant in the jurors' minds the notion that Carillo, in calling for the services of a lawyer, was implicitly conceding his involvement in the homicide. The offending examination was as follows:

"Q. And when were you told that you were under arrest?
A. I was downstairs when the state police detective told me.
Q. He told you that you were under arrest for murder didn't he?
Mr. Cicilline: Objection.
The Court: Sustained.
Q. Well, what did he tell you that you were under arrest for?
Mr. Cicilline: Objection.
The Court: Overruled.
A. I think he said I was just under arrest, that if I wanted a lawyer I could have a lawyer.
Q. Gave you your constitutional rights?
Mr. Cicilline: Objection. * * * I move to pass [after stating reasons for objection].
Q. Gave you your constitutional rights? Ask you if you needed a lawyer, is that correct?
A. Yes, but he wouldn't give me one when I said I wanted a lawyer. He wouldn't give me one.
Q. You asked him for a lawyer, is that correct?
A. He said I could have a lawyer. I said yes, I want a lawyer."

The question of improper prosecutorial comment arose recently in *State* v. *Andrews*, 120 R.I. 771, 390 A.2d 926 (1978). In that case we reaffirmed the standard laid down in *State* v. *Fontaine*, 113 R.I. 557, 563, 323 A.2d 571, 574 (1974), that the language under consideration must have been " 'manifestly intended' or * * * of such a character that a jury would naturally and necessarily construe it to amount to a comment" on the defendant's invocation of his constitu-

tional rights. Reviewing the challenged comment in context, as we must, *State* v. *Andrews,* 120 R.I. 771, 775-76, 390 A.2d 926, 929 (1978), *State* v. *Sawyers,* 116 R.I. 230, 234, 354 A.2d 115, 117 (1976), we find it clear that neither prong of the *Fontaine* test is satisfied. In particular, the jury, unaware of the legal niceties involved, clearly would not "naturally and necessarily" construe the remarks as implying Carillo's own knowledge of his guilt. That being the case, we can find no ground for reversal.

Carillo's final objection is that the trial court erred in admitting into evidence certain portions of the autopsy report prepared with respect to Price. Doctor Joseph A. Palumbo, acting chief medical examiner, both conducted the autopsy and testified to its results at trial. During the course of his testimony, Dr. Palumbo referred to two pages of handwritten notes and diagrams, which were admitted into evidence over Carillo's objection. Carillo's position is that the writings were used to refresh the physician's recollection on the stand and, therefore, are allegedly inadmissible unless offered by the opposing party. *E.g.,* Fed. R. Evid. 612.

It seems obvious that Dr. Palumbo used his notes and drawings to illustrate or clarify the testimony that he was presenting, as well perhaps as to guard against some unexpected lapse of memory. McCormick addresses the issue before us in the following terms, which we think more relevant to the question presented than are considerations of refreshing a witness' present memory:

> "It is today increasingly common to encounter the offer of tangible items which are not contended themselves to have played any part in the history of the case, but which are instead tendered for the purpose of rendering other evidence more comprehensible to the trier of fact. Examples of types of items frequently offered for purposes of illustration and clarification include * * * charts [and] drawings. If an article is offered for those purposes, rather than as real or original evidence, * * * the theory justifying admission of these exhibits requires

only that the item be sufficiently explanatory or illustrative of relevant testimony in the case to be of potential help to the trier of fact." McCormick, *Evidence* §212 at 528. *Cf. Segee* v. *Cowan,* 66 R.I. 445, 20 A.2d 270 (1941).

The use of such aids as sketches is a matter addressed to the sound discretion of the trial justice, and we find nothing that convinces us that the trial justice improperly exercised his discretion.

The defendant's appeal is denied and dismissed; the judgment of conviction appealed from is affirmed.

Mr. Justice Joslin participated in the decision but retired prior to its publication. Mr. Chief Justice Bevilacqua did not participate.

*Dennis J. Roberts II,* Attorney General, *Barry N. Capalbo,* Special Assistant Attorney General, for plaintiff.

*William F. Reilly,* Public Defender, *Barbara Hurst,* Chief Appellate Attorney, *Dale G. Anderson,* Assistant Public Defender, for defendant.